A05A1629. YUN v. UM et al.

(627 SE2d 49)

ADAMS, Judge.

Chul H. Yun filed suit against Suwan Um, Chong Cha, and Bruce Yi for conversion, theft, money had and received, and for breach of contract against Yi. In suing for conversion, Yun alleged that Yi, without authorization, had wired $150,000 from a business checking account to Um and Cha. Yun also claimed that Yi owed him 29 monthly payments of $4,000 each for a total of $116,000.

Um, Cha, and Yi defended against Yun's claims by asserting the affirmative defense of accord and satisfaction. After a bench trial, the trial court awarded judgment against Yun, after concluding that Yi's payment of $50,000 to Yun comprised an accord and satisfaction. Yun appeals.

On appeal from a bench trial, we defer to the trial court's factual findings when they are supported by any evidence. See *Hayes v. Alexander*, 264 Ga. App. 815 (592 SE2d 465) (2003). We owe no deference, however, to the trial court's legal analysis or legal conclusions. See *Suarez v. Halbert*, 246 Ga. App. 822, 824 (1) (543 SE2d 733)

(2000). And, "[w]here it is apparent that a trial court's judgment rests on an erroneous legal theory, an appellate court cannot affirm. [Cit.]" *Gwinnett County v. Davis,* 268 Ga. 653, 655 (492 SE2d 523) (1997). This is such a case.

On November 3, 2000, Yun, as an individual, purchased an existing liquor store from Good Libations, Inc. d/b/a Beverage City, and Ronalee Siegel. Yun paid an adjusted purchase price of $1,195,000 for the realty and the business. In doing so, Yun individually guaranteed payment of two promissory notes: an $800,000 note to Siegel and a $140,000 note to Good Libations. The deed to secure debt was solely in Yun's name, as was the security agreement. Only Yun's name was on the recorded warranty deed. Yi's name did not appear on any of the documents that related to the purchase of the business. Nor did the name of any partnership, corporation, or other business entity appear as purchaser, guarantor, or debtor. Every legal document relating to the purchase was either in the name of "Chul Ho Yun" or "Chul Ho Yun, an individual." The $800,000 promissory note obligated Yun to pay Siegel $8,353.80 per month for 120 months followed by a lump sum payment of $402,928.06 due January 1, 2011. Under the $140,000 note, Yun was personally required to pay $2,940.26 for 59 months followed by a final payment of $2,940.33 in the 60th month.

Both Yun and Yi invested funds in the purchase of the liquor store. Yun invested $150,000 toward the purchase and an additional $50,000 in "starter money." Yi contributed $100,000 toward the business, money that Yi borrowed from his sister-in-law, Um. Prior to buying the liquor store, Yun had employed Yi for about ten years and Yi had previously managed a grocery store for Yun that had lost money. Yun testified that due to this prior bad experience with Yi, "I didn't feel comfortable going into business together." According to Yun, in exchange for Yi's investment of $100,000 in the business, he agreed to let Yi manage Beverage City and to retain all profits above $4,000 per month. Up until this point, Yi had always been "just a straight salary employee." All of the licenses, accounts with liquor distributors, and other accounts named only Yun, who had sole responsibility for them.

Nearly two months before Yun finalized the purchase of the liquor store, Yun and Yi opened a commercial account at Wachovia in the name of "Beverage City." Yun signed the signature card as CEO and Yi did so as president. The record contains no evidence that Beverage City was ever incorporated. Both Yun and Yi had check writing privileges on Beverage City's account at Wachovia. By mutual agreement, Yi was responsible for the day-to-day operation of Beverage City and Yun had little to do with its operation. At that time, Yun also owned several other businesses.

After some time, Yun became dissatisfied with Yi's management and felt that Yi "ran the business down." Because Beverage City was losing money and Yi was behind in paying him the $4,000 per month, Yun decided to sell the business. On September 25, 2003, Yun sold the business to Welde Enterprises, Inc. for $951,000, substantially less than he paid for the business less than three years earlier. Under the terms of the sale, Yun became individually obligated as guarantor on an installment note of $471,000. Yun testified that for tax purposes, on advice from his CPA, he used the corporate name of Momo Enterprise, Inc. on some of the sales documents. Even so, nothing in any of the 23 documents relating to the sale of the business indicated that Yi was Yun's partner or that a business partnership was conveying an interest to the purchaser. After an offset of $80,000 to the new owner to adjust an inventory shortfall and the payment of $13,200 to a liquor distributor, the net proceeds from the sale were approximately $317,000.

Yun told Yi that he planned to give him $20,000 to $30,000 after the sale. Yi testified that "but I got to have more than that." On September 29, four days after Yun sold the business and deposited the proceeds in Beverage City's commercial account at Wachovia, Yi withdrew $150,000 from the business checking account and wired $150,000 to his sister-in-law. Yi testified that he felt justified in doing so because there was approximately $300,000 in the commercial account and he was entitled to "a 50/50 share."

When Yun discovered that $150,000 was missing from the checking account, he became angry and confronted Yi. When Yi admitted taking $150,000, Yun told him that the money was not his to take. Yun went to the College Park Police Department to take out a criminal warrant against Yi for stealing but was told that he could not because Yi had lawful access to the checking account as a signatory. Next, Yun went to Um's liquor store where he confronted Um about "why she took stolen money, $150,000." Yun testified that Um explained that she had loaned Yi that money.

Shortly after this dispute arose, two mutual Korean friends arranged a meeting with Yun and Yi. On October 15, 2003, at the behest of Tellyus Jun Kil and a Mr. Cho, Yun and Yi met at the back room of Cho's liquor store. Yun testified that Kil had called him to say that Yi had some money for him, so he had rushed to meet them. Yun testified that "Bruce [Yi] hand me a $50,000 check. He say here is some money for you and he say he was sorry. He say he was going to talk to his wife and see if he could get some more money out of her. So I left." Yun denied reaching an agreement to settle all of their differences for $50,000.

Yi testified that he was told that the purpose of the meeting was settlement and he brought a check for $50,000 with him. The $50,000

check dated October 15, 2003 was payable to Yun on a Bank of America account belonging to "Suwan Um or Chong Cha." Yi explained that Yun had been contacting his parents and members of his family asking them about the money, "[s]o I wanted to give $50,000 for settlement to make him happy. And then that's why we had meeting I guess. And then he was happy. Both of us are happy. And that was it." When Yi was asked, "[w]as it — would you state to the court whether or not it was your understanding that when you departed from that meeting that y'all's differences had been settled?" Yi responded, "No."

Yun emphatically denied reaching a settlement. Yun testified that "[i]t was never a final settlement, no. Because . . . he handed me $50,000 and I was upset at that time and I took the check and I left. I assume it was for inventory because he shorted me almost 60 some thousand dollars in inventory."

Yun also denied forming a partnership with Yi, having Yi as his business partner, and that Yi was a 50/50 owner in the business. To Yun, Yi was the store manager. Yi, on the other hand, claimed that they were 50/50 partners. Yi testified, "[s]o half of those is mine I figure."

Ultimately, the trial court's judgment for the defendants turned on two findings. First, the court found that Yun and Yi "acquired and operated the liquor store as a partnership." Based on that finding, the trial court decided that "[u]pon the sale of the store, each partner was entitled to receive a share of the proceeds." The trial court, however, did not address what percentage share Yi deserved nor did the court appear to consider the fact that Yun had invested significantly more money into the business. Next, in deciding there was an accord and satisfaction of all disputes, the trial court found that "the parties had discussed all of the issues in contention prior to the offer and acceptance of the $50,000 check." The trial court noted, "[t]his conclusion is supported by the fact that the end result left both Mr. Yun and Mr. Yi with an amount approximately equal to the initial investments they had made toward the purchase of the store."

1. Yun contends that the trial court erred in finding the existence of a partnership and by finding that Yi was entitled to receive a share of the proceeds of the sale of the business. We agree.

OCGA § 14-8-8 establishes certain rules and presumptions with respect to partnership property. Subsection (a) states,

> [s]ubject to subsection (d) of this Code section, property, whether real or personal, is presumed to be partnership property where: (1) It is included as such in the agreement of

partnership or described in any recorded statement of partnership under Code Section 14-8-10.1; or (2) It is acquired in the partnership name.

OCGA § 14-8-8 (a). Here, the record shows that Beverage City was not included in any partnership agreement, described in any recorded statement, or acquired in a partnership name. In the next subsection, the Code states, "[s]ubject to subsection (d) of this Code section, property is presumed to be partnership property if it is purchased with partnership funds even though the title or other interest is acquired in the name of an individual partner or partners." OCGA § 14-8-8 (b). No property was purchased with *partnership* funds. Yun purchased the liquor store with his funds and by taking out loans and Yi contributed $100,000 borrowed from his sister-in-law. All of the documents relating to the purchase of the business in November 2000 indicate that Yun purchased the business as an individual. No "partnership funds" were used to purchase the liquor store and so no presumption of partnership property arose as to the ownership of the business under OCGA § 14-8-8.

Then, when Yun sold the business in September 2003, the purchase and sale documents again indicate that Yun, individually, was the seller, although in conjunction with Momo Enterprise.[1] In addition, other documents from the September 2003 sale of the business reflect that Yun, not Yun and Yi or any partnership entity, remains liable as an individual guarantor should the purchaser, Welde Enterprises, default on its payments to Siegel. None of this evidence shows the existence of a partnership or a 50/50 partnership.

Moreover, the terms of an agreement granting a party the right to profits does not constitute evidence of the existence of a partnership as opposed to a debtor/creditor relationship. *Barton v. Marubeni America Corp.*, 204 Ga. App. 346, 348 (419 SE2d 342) (1992).Thus, the fact that Yi had a right to the profits each month after Yun was paid $4,000, did not establish the existence of a partnership. See id.

Also, under OCGA § 14-8-15 (a) "[e]xcept as provided in subsection (b) of this Code section, all partners are jointly and severally liable for all debts, obligations, and liabilities of the partnership." Here, the record contains no evidence that Yun and Yi entered an agreement to create an exception to the rule of joint liability under which Yun would be individually liable for the debts, obligations, and liabilities of a partnership.[2]

---

[1] Momo was incorporated in 1998, nearly two years before Yun purchased the liquor store.

[2] In fact, Yun testified that the new owner of the liquor store was suing him because the inventory was short $8,000 and because Yi "didn't pay the employees." Yun testified that he was

Given the absence of documentary evidence that Yi had an ownership interest in the liquor store, the absence of any written or recorded partnership agreement, and the absence of evidence that Yun and Yi operated the business as a partnership within the meaning of Georgia's Uniform Partnership Act (OCGA § 14-8-1 et seq.), the trial court's dual findings that the liquor store was "acquired and operated as a partnership" and that Yi as a "partner" of Yun was "entitled to receive a share of the proceeds" from the sale of the business are lacking in evidentiary support.

2. Yun contends that the trial court erred in finding there was a settlement agreement between him and Yi that resolved all issues. Yun claims that the trial court erred in entering judgment on that basis. We agree.

OCGA § 13-4-101 provides in part: "Accord and satisfaction occurs where the parties to an agreement, by a subsequent agreement, have satisfied the former agreement, and the latter agreement has been executed." An accord and satisfaction is in itself a contract and to be valid and binding, it must have all the elements of a de novo contract. *Popovich v. Bekaert Corp.*, 222 Ga. App. 395, 396 (474 SE2d 286) (1996). Like any other contract, an accord and satisfaction requires a meeting of the minds. *Derosa v. Shiah*, 205 Ga. App. 106, 108 (421 SE2d 718) (1992). "Further, an accord and satisfaction may settle one or more claims, or a portion of a claim, without prejudicing the remaining claims." (Citation omitted.) *Hosp. Auth. of Houston County v. Pyrotechnic Specialties*, 263 Ga. App. 886, 888 (589 SE2d 644) (2003). In addition, "[a]n accord and satisfaction must be of some advantage, legal or equitable, to the creditor or it shall not have the effect of barring him from his legal rights under the original agreement." OCGA § 13-4-102.

Without question, on October 15, 2003, a meeting took place where Yi arrived with a $50,000 check from his sister-in-law. At some point during that meeting, Yun was handed a check for $50,000. At another point, Yun and Yi shook hands. But the record contains no evidence of the formation of a new, binding and enforceable contract within the meaning of OCGA § 13-4-101. No new contract or agreement was substituted for the old. Nothing on the face of the check indicates that it was a "final settlement." Nor was there a meeting of the minds. Instead, Yun and Yi denied understanding that all issues were resolved.

Also, as a general rule, an essential element of an accord and satisfaction is a bona fide dispute or controversy where the entire debt or disputed claim is settled by giving less than the amount of

---

having to defend himself in the lawsuit and was being sued for approximately $12,000.

money claimed; however, this rule does not apply where the damages are unliquidated. *Burgamy v. Holton,* 165 Ga. 384 (141 SE 42) (1927). Here, the damages were unliquidated. Compare *Crow v. Bowers,* 204 Ga. 786 (3) (51 SE2d 855) (1949).

Yi testified that he felt entitled to $150,000 as "a 50/50 share" and not the $20,000 to $30,000 that Yun planned to give him. Yi repeatedly testified that he and Yun were equal partners and that he thought half of the $300,000 was his. Yi did not acknowledge the existence of a bona fide debt owed to Yun, testifying instead that Yun was contacting his relatives about the money and that he just wanted to make Yun happy. Thus, the damages at issue were not liquidated and the amount of Yi's debt to Yun was not certain, agreed to by the parties, or fixed by law. See *Hargroves v. Cooke,* 15 Ga. 321, 332 (1854).

When Yi availed himself of the funds in Beverage City's commercial account at Wachovia, the money in that account did not belong to Yi but to the business. On remand, a determination must be made as to the exact nature of the business relationship between Yun and Yi, and the amount, if any, that Yun owes to Yi. Yun's plan to give $20,000 to $30,000 after the sale constitutes some evidence that Yi is entitled to some amount or may be entitled to a credit should it be determined that Yi also owes $116,000 to Yun as Yun claims. Whether Yun can recover against Um and Cha remains for resolution.

*Judgment reversed. Smith, P. J., and Ellington, J., concur.*

DECIDED JANUARY 13, 2006 —

*Higgins & Dubner, Michael W. Higgins,* for appellant.

*Lefkoff, Duncan, Grimes & Miller, John R. Grimes, Robert A. Harrison II,* for appellees.