A10A1395. LUMSDEN et al. v. WILLIAMS et al.

(704 SE2d 458)

ADAMS, Judge.

George W. Lumsden and Helen F. Lumsden filed this appeal after the trial court granted summary judgment to Stephen P. Williams and Elizabeth McGee (hereinafter referred to collectively as the "Sellers") on the Lumsdens' claims arising from alleged construction defects in their home.

The Sellers began construction on the home, a log-cabin style house in Chattooga County, in March 2004. George Lumsden con-

tracted to purchase the house from the Sellers on December 1, 2005.[1] Under the "New Construction Purchase and Sale Agreement" (the "Agreement") he executed with the Sellers, the Sellers agreed to warrant the property "against all defects in labor and materials" for a one-year period. On the day of the closing, December 19, 2005, George Lumsden and the Sellers signed a "Walk Through List" of items to be completed after closing in accordance with the Agreement. This document provided that it "shall amend the prior Agreement of the parties." In addition, under the Walk Through List, the Sellers furnished a one-year guarantee "on basement not leaking." The parties further stipulated that the closing attorney would withhold $10,000 in escrow until the items on the Walk Through List were completed. The transaction proceeded to closing, and the Lumsdens took possession of the property the next day, on December 20, 2005.

Three months later, on March 16, 2006, the parties hand-wrote a stipulation on the face of the Walk Through List indicating that the list "has been completed" as of that date and agreeing that the escrow funds would be divided between the parties, with $9,300 going to the Sellers and $700 to the Lumsdens "due to expenses incurred in accomplishing certain items on walk through list and other expenses." This stipulation was initialed by both Lumsdens and Stephen Williams.

In August 2006, the Lumsdens noticed that the window above the front door was leaking, and they concluded that the logs on the east wall of the house were not properly sealed. They notified the Sellers of this problem, and the Sellers sent a repairman to caulk the window, but the problems persisted. The Lumsdens contend, however, that because the Sellers were unresponsive to their requests for further repairs, they retained legal counsel who advised hiring a home inspector to examine their property. That inspector, John Fox, issued a report identifying numerous defects in the home (the "Fox report"). On October 24, 2006, the Lumsdens sent the Sellers a copy of the Fox report and demanded that repairs be made within one month. The Sellers responded on November 16, 2006, through their attorney, who stated that he would attempt to have a response, "if possible, by your deadline" of November 24, but if not, he requested more time to prepare his response.

But instead of allowing additional time, the Lumsdens' attorney informed the Sellers that he was instructing his client to make "immediate remedial repairs" on the house to prevent further

---

[1] Helen Lumsden was not a signatory to the Agreement or the subsequent "Walk Through List."

damage. In mid-December, the Lumsdens hired a contractor to do those repairs. By letter dated January 19, 2007, the Sellers took the position that they had no obligation to make repairs to the house because the one-year comprehensive warranty in the Agreement was superseded by the one-year warranty against basement leaks found in the Walk Through List. The letter also noted that the Lumsdens had failed to provide the notice required under OCGA § 8-2-38 and the parties' Agreement.[2] Thus, the Sellers asserted that the Lumsdens had not properly allowed them the opportunity to make repairs. See OCGA § 8-2-35 et seq. (the "Repair Act").

The Lumsdens responded by filing this action against the Sellers on March 27, 2007, without first giving the statutorily-required notice. The Sellers answered and moved to dismiss due to the Lumsdens' failure to provide the required notice. The trial court subsequently issued an order directing the Lumsdens to provide notice under OCGA § 8-2-38 and staying the action until the Sellers had exercised their rights under the statute. The Lumsdens' subsequent notice referenced both the Fox report and the report of professional engineer, James H. Robinson (the "Robinson report"). But the parties could not resolve the repair issues, and the litigation resumed. After the trial court granted summary judgment to the Sellers, the Lumsdens filed this appeal.

1. The Lumsdens first assert that the trial court erred in denying their "Motion For Judicial Notice of the Minimum Standard Residential Code As Adopted in Georgia."[3] This motion asked the trial court to take judicial notice of Rule 110-11-1-.11 of the Georgia Department of Community Affairs ("DCA") relating to the applicable building code for one- and two-family dwellings. The trial court denied the motion on the ground that the DCA had exceeded its authority in adopting the rule.

Georgia courts are required to take judicial notice of any rule passed under the Administrative Procedure Act ("APA"), OCGA § 50-13-8. Although there appears to be no dispute that Rule 110-11-1-.11 was passed under the APA, the Sellers argued that the DCA's adoption of the rule was invalid. At the time the construction began on the Lumsdens' house, the General Assembly had adopted "the Council of American Building Officials One- and Two-Family Dwelling Code" or "CABO" as the applicable state minimum standard

---

[2] The parties' Agreement contained a provision, in all capital letters, specifically informing the Lumsdens of the statutory notice requirement and stating that the failure to follow the statutory requirements may affect the buyer's ability to file a lawsuit or other action.

[3] Contrary to the Sellers' contention, this Court has jurisdiction to review this order under OCGA § 5-6-34 (d).

code. OCGA § 8-2-20 (9) (A) (i) (VI) & (9) (A) (ii); Ga. Laws 1990, p. 1364, § 1.[4] The legislature also gave the DCA authority to "adopt a subsequently published edition of any such code" as provided in OCGA § 8-2-23 (b), and to amend or revise the code. OCGA § 8-2-20 (9) (A) (ii). OCGA § 8-2-23 (b) (1) authorizes the DCA to adopt "a new edition of any state minimum standard code." The CABO became applicable statewide without adoption by any municipality or county under the then-existing version of OCGA § 8-2-25 (a), and thus it constituted the minimum standard for Chattooga County, which has no locally adopted standards or permitting requirements for construction.

In 2002, the DCA promulgated Rule 110-11-1-.11, which purported to adopt a new edition of the CABO, identified as the "CABO ONE AND TWO FAMILY DWELLING CODE (International Residential Code for One and Two Family Dwellings) 2000 Edition, published by the Southern Building Code Congress International, Inc."[5] (hereinafter the "IRC"). Ga. Comp. R. & Regs. 110-11-1-.11. Later, in 2004, the General Assembly amended OCGA § 8-2-20 to provide that the IRC would constitute the state minimum standard code after July 1, 2004. OCGA § 8-2-20 (9) (B) (i) (VI); Ga. Laws 2004, Act 534, § 1, eff. July 1, 2004. See also OCGA § 8-2-25 (a) (providing that on and after July 1, 2004, the IRC would have state-wide application without adoption by a municipality or county).

The Lumsdens' motion asked the trial court to take judicial notice of Rule 110-11-1-.11 and to hold that the IRC, and its later amendments, constituted the applicable building code for their property. The trial court determined, however, that the IRC was not a new or subsequent "edition" of the CABO, but rather a new code, and held that the DCA had no authority to adopt the IRC in 2002. Because construction on the home began in March 2004, the trial court found that the CABO, and not the IRC, constituted the applicable minimum standard code in this case.

The Lumsdens do not appear to dispute that the applicable code should be determined as of the beginning of the home's construction, even though the legislature adopted the IRC mid-construction.[6] We must determine, therefore, whether the IRC can be considered a later edition of CABO and thus whether it could properly be adopted

---

[4] At the time, this provision was codified as OCGA § 8-2-20 (9) (B) (i) (VI).

[5] The DCA rule also reflects the adoption of a number of amendments to that code.

[6] Cf. *WMM Properties v. Cobb County*, 255 Ga. 436, 438 (1) (b) (339 SE2d 252) (1986) (builder has right to rely upon original building permit notwithstanding subsequent zoning or regulatory changes and notwithstanding lack of substantial expenditure of funds). Although Cattoosa County has no permitting requirements, the Sellers apparently had drawn up their plans and begun construction prior to the legislature's adoption of the IRC.

by the DCA, or whether it represents a completely separate code.

The parties presented portions of these codes in conjunction with the motion for judicial notice. These documents show that the 1995 edition of the CABO was copyrighted by the Council of American Building Officials, "under the nationally recognized model codes" of the Building Officials Code Administrators ("BOCA"), the International Conference of Building Officials ("ICBO") and the Southern Building Code Congress International, Inc. ("SBCCI"). The IRC documents confusingly contain a cover page entitled "2000 CABO One- And Two-Family Dwelling Code" with the SBCCI logo, but the IRC, itself a self-contained document, reflects that it is copyrighted by the International Code Council (the "ICC") and published in cooperation with BOCA, ICBO and SBCCI. Although some of the same organizations may have been involved in the development of both codes, the preface to the IRC makes it clear that it was intended to be a "comprehensive, stand-alone residential construction code," which was developed after a task force was formed to study performance under the CABO. The ICC formed a code-drafting committee to "develop a draft of a comprehensive residential code that is consistent with and inclusive of the scope and content of the existing model building codes and the International One- and Two-Family Dwelling Code."

By its own terms, therefore, the IRC is not a subsequent or new edition of the CABO, but rather an entirely new code based upon a study of a number of existing building codes. The distinction between the CABO and the IRC is further evidenced by the legislature's adoption of the IRC as the state minimum standard code in 2004. If the IRC were just a later edition of the CABO, this amendment would have been unnecessary. Accordingly, the trial court correctly found that the DCA exceeded its authority in adopting the IRC as a later, "2000 edition" of CABO, and the court properly denied the Lumsdens' judicial notice motion. See *Dept. of Human Resources v. Anderson*, 218 Ga. App. 528, 529 (462 SE2d 439) (1995) (administrative rule that "exceeds the scope of or is inconsistent with the authority of the statute upon which it is predicated is invalid. [Cits.]").

2. The Lumsdens next contend that the trial court erred in granting summary judgment in favor of the Sellers.

(a) The Lumsdens first assert that the trial court erred in finding that their construction defect claims present no issue of fact regarding CABO violations. The trial court did not, in fact, grant summary judgment as to any CABO violations; rather, it granted the Sellers partial summary judgment as to all claims for alleged violations of the IRC. In reaching this determination, the trial court found that the reports of both of Lumsdens' experts, Fox and Robinson, were

predicated on the IRC, and the court noted that although these reports could have been made to conform to the court's ruling that the CABO code applied, the Lumsdens chose not to do so. Accordingly, the trial court struck the experts' affidavits as non-probative.

For the reasons set forth in Division 1 above, we find no error in the trial court's grant of partial summary judgment as to any claims for violations of the IRC. We also find that the trial court properly struck both expert affidavits. Robinson testified that his report was predicated on the IRC. And although the Fox report refers only to "Code" requirements without specifying the code upon which the report was based, the Lumsdens consistently maintained that the IRC was the applicable code. Even if the Lumsdens could assert a claim specifically based upon CABO violations, it appears that they never did so. So without further clarification or revision, the trial court could properly assume that the Fox report also relied upon the IRC, not the CABO. We note, however, that nothing in the trial court's holding prevents the Lumsdens from presenting evidence of CABO violations at trial in support of their remaining claims.

(b) The Lumsdens next assert that the trial court erred in determining that their remedial repair efforts entitled the Sellers to summary judgment under the Repair Act. We agree.

The Repair Act was passed to facilitate a method of alternative dispute resolution for construction disputes by requiring pre-litigation notice of such claims and "providing the contractor with the opportunity to resolve the claim without litigation." OCGA § 8-2-35. Under OCGA § 8-2-38 (a), a party who has a claim for construction defects is required to provide the contractor written notice of these defects no later than 90 days before initiating an action. The statute then contemplates that the contractor will have the option of offering a monetary settlement or making an inspection of the premises and potentially making repairs. If the matter is not resolved, then the claimant may file suit. OCGA § 8-2-38 (b)-(p). If a claimant files an action without first providing notice, however, the Repair Act states that "on application by a party to the action, the court or arbitrator shall stay the action until the claimant has complied with the requirements of this part." OCGA § 8-2-37. Thus, nothing in the Repair Act contemplates that a claimant's action be dismissed for failing to provide the pre-litigation notice under OCGA § 8-2-38. Rather any pre-notice action is stayed to afford the parties time to try to resolve their disputes.

Here, the trial court followed the statutory procedure by staying the action to allow the parties an opportunity to resolve their differences outside of litigation. When that process proved unsuccessful, the litigation proceeded. Thus, the purpose of the Repair Act was served. And while the Lumsdens' repairs to their home before

the Sellers were afforded an opportunity to resolve the dispute may create a jury issue as to any potential damages, it does not authorize the grant of summary judgment in the Sellers' favor. Nothing in the act prevents a potential claimant from taking action to mitigate his losses. Accordingly, we reverse the trial court's grant of summary judgment on this ground.

(c) The Lumsdens further contend that the trial court erred in awarding summary judgment to the Sellers on the items referenced in the Walk Through List. The trial court found that the Lumsdens' recovery on these items was limited to the $700 they withheld in connection with the post-closing repairs. The trial court held that "as a matter of law, the amount withheld by the [Lumsdens] constituted an accord and satisfaction of any disputes between [the parties] regarding the items listed on the special stipulations, the Walk Through List and the items listed March 16, 2006."

The parties' agreement regarding the completion of the list and the distribution of the escrowed funds clearly prevents the Lumsdens from claiming that the Sellers did not perform repairs or that the Lumsdens had not been paid for their portion of such repairs. But the trial court erred in finding that the parties reached an accord and satisfaction as a matter of law as to all claims regarding the quality of the Sellers' repairs. An accord and satisfaction is a separate agreement and thus must meet the requirements for forming a contract:

> An accord and satisfaction is in itself a contract and to be valid and binding, it must have all the elements of a de novo contract. Like any other contract, an accord and satisfaction requires a meeting of the minds. Further, an accord and satisfaction may settle one or more claims, or a portion of a claim, without prejudicing the remaining claims. In addition, an accord and satisfaction must be of some advantage, legal or equitable, to the creditor or it shall not have the effect of barring him from his legal rights under the original agreement.

(Citations and punctuation omitted.) *Yun v. Um*, 277 Ga. App. 477, 482 (2) (627 SE2d 49) (2006). An accord and satisfaction also requires that parties have a bona fide dispute prior to the tender of any amount less than that due under their contract. *Quintanilla v. Rathur*, 227 Ga. App. 788, 793 (3) (490 SE2d 471) (1997). Generally, "[t]he question whether the parties reached an accord and satisfaction is for the factfinder unless there are no genuine issues of material fact." (Citations omitted.) *Sanders v. Graves*, 297 Ga. App. 779 (678 SE2d 220) (2009).

Here, jury issues remain as to whether any bona fide dispute existed between the parties at the time the Lumsdens agreed to the release of the funds. And it is up to a jury to decide whether they accepted $700 in exchange for releasing any claims as to the quality of workmanship on those repairs or whether they simply agreed to split expenses based upon the relative work performed by each party. Accordingly, we reverse the grant of summary judgment to the Sellers on the ground of accord and satisfaction.

(d) In addition, the Lumsdens argue that the trial court erred in finding that the warranty as to leaks in the basement contained in the Walk Through List superseded the general warranty against defects and materials contained in the parties' Agreement. We agree.

The trial court based this conclusion solely on the language in the Walk Through List stating that it "shall amend the prior agreement of the parties." But the Walk Through List does not state that it supersedes the Agreement, and an amendment does not automatically result in a novation of a prior contract. Rather, "[a] novation or accord and satisfaction is in itself a contract and must have all the elements of a de novo contract. There must be, inter alia, the extinguishment of the old contract. In the absence thereof, there can be no novation." (Citation omitted.) *Executive Fitness v. Healey Bldg. Ltd. Partnership*, 290 Ga. App. 613, 616 (3) (660 SE2d 26) (2008). Moreover, the trial court's holding ignores language in the Agreement providing that any conditions or stipulations which the parties agreed would be performed or fulfilled after the closing would survive the closing. The Agreement indicates, therefore, that the parties intended that the one-year general warranty survive the closing.

This creates a jury issue as to whether the parties intended to extinguish the prior warranty. A question also arises as to whether George Lumsden received consideration under the Walk Through List to support an agreement to forgo the warranty covering the entire house in exchange for a warranty covering the basement. Jury issues exist, therefore, as to whether the basement warranty was intended to supplement the general warranty or to replace it. Accordingly, the trial court erred in granting the Sellers summary judgment on this ground.

(e) The Lumsdens also assert that the trial court erred in finding that the one-year general warranty would only cover claims that were reported within one year. It goes without saying that the warranty applied only to defects that arose within the warranty period, but the trial court erred in finding that the Lumsdens were limited to recovering only for defects that were also reported to the Sellers during that period. The warranty imposed no requirement that the Lumsdens provide notice of defects within one year. See

*Nulite Indus. Co. v. Horne*, 252 Ga. App. 378, 380 (3) (556 SE2d 255) (2001) (claims under one-year warranty with no notice requirement not barred even though reported two-and-a-half years after installation). Compare *Stimson v. George Laycock, Inc.*, 247 Ga. App. 1, 4-5 (2) (542 SE2d 121) (2000) (jury issue existed as to claimants' compliance with warranty provision containing specific notice requirements). The trial court erroneously relied upon *Fort Oglethorpe Assocs. II v. Hails Constr. Co. of Ga.*, 196 Ga. App. 663, 664 (2) (396 SE2d 585) (1990), to impose such a notice requirement. In that case, the defect in question, a leak, neither occurred nor was reported within the warranty period. Although the opinion notes that all other defects had been reported within the time of the warranty, it imposes no requirement that claims under a warranty must be reported within the warranty period. Rather this Court affirmed the grant of summary judgment as to any claims arising out of the post-warranty leak and any "subsequent claims."

Accordingly, the trial court erred to the extent that it granted summary judgment as to claims for breach of warranty arising out of defects occurring within the warranty period, but properly granted summary judgment as to breach of warranty claims for defects occurring after the warranty period.

(f) The Lumsdens assert that the trial court erred in granting summary judgment as to all claims for damages by Helen Lumsden. The trial court based this ruling upon the " 'long established' acceptance doctrine" which

> provides that where the work of an independent contractor is completed, turned over to, and accepted by the owner, the contractor is not liable to third persons for damages or injuries subsequently suffered by reason of the condition of the work, even though he was negligent in carrying out the contract, at least, if the defect is not hidden but readily observable on reasonable inspection.

(Citation and punctuation omitted.) *Smith v. Dabbs-Williams General Contractors*, 287 Ga. App. 646, 647 (653 SE2d 87) (2007). Helen Lumsden was not a party to the original Agreement or the Walk Through List and thus the trial court correctly found that she would be bound by the acceptance doctrine for any work performed and accepted by her husband under those agreements even if the work was negligently performed (if it could be discovered by reasonable inspection). But in any event, Helen Lumsden has no basis for asserting claims for breach of contract or breach of warranty in this case as she cannot be considered a third-party beneficiary of either the Agreement or the Walk-Through List. A "third-party beneficiary

must be the intended beneficiary of the contract. The mere fact that a third party would benefit incidentally from the performance of the contract is not alone sufficient to give such person standing to sue on the contract." *Hubbard v. Dept. of Transp.*, 256 Ga. App. 342, 352 (4) (568 SE2d 559) (2002). Neither agreement makes any mention of Helen Lumsford as an intended beneficiary. And although she initialed and signed the handwritten notations authorizing the release of the escrowed funds in March 2006, those signatures only indicate her agreement to that release; it does not make her a party or a beneficiary of the parties' agreements. We conclude, therefore, that the trial court correctly granted summary judgment as to Helen Lumsden's claims arising out of the Agreement and the Walk Through List as she was not a party to or an expressly intended beneficiary of either agreement.[7]

*Judgment affirmed in part and reversed in part. Smith, P. J., and Mikell, J., concur.*

DECIDED NOVEMBER 30, 2010.

*Richard S. Alembik, Willis L. Miller IV*, for appellants.
*Bentley, Bentley & Bentley, Fred D. Bentley, Sr.*, for appellees.

---

[7] The Lumsdens do not appeal the trial court's grant of summary judgment as to their claims for health problems allegedly caused by well water, for fraud and for punitive damages, and we do not address such claims.