**THIRD DIVISION
BARNES, P. J.,
BOGGS and BRANCH, JJ.**

**NOTICE: Motions for reconsideration must be _physically received_ in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules/**

**July 16, 2014**

# In the Court of Appeals of Georgia

A14A0389. JAI GANESH LODGING, INC. et al. v. DAVID M. SMITH, INC. et al

BOGGS, Judge.

Jai Ganesh Lodging, Inc. and Laxesh, L.P. appeal from the trial court's order granting summary judgment in favor of David M. Smith, Inc. ("DMS") and B & J Reed Construction, LLC ("B & J Reed"), an order rescinding its previous order allowing Baron and Jeremy Reed to be added as defendants, and an order excluding the testimony of an expert witness. For the reasons explained below, we affirm the trial court's order excluding the appellants' expert, reverse its order dismissing the appellants' complaint against Baron Reed and Jeremy Reed, affirm the grant of summary judgment on the breach of contract claims, and reverse the grant of summary judgment on the claims of negligent construction.

This case arises from structural damage to a newly constructed Holiday Inn Express resulting from settlement of the rear parking lot, pool areas, and one side of the building itself. The record shows that Laxesh, L. P. owns the real property on which the Holiday Inn Express is located and that Jai Ganesh Lodging, Inc. holds the franchise rights to and operates the Holiday Inn Express. In April 2007, site plans for the Holiday Inn Express were created by Rhodes Engineering Services, Inc., and the site plans list Anil Patel ("Patel") as the "owner/developer/24-hour emergency contact" person.[1]

In April 2007, DMS submitted an initial bid for grading work on the Holiday Inn Express site. In May 2007, the principal of DMS, David Smith, suffered a stroke, and told Patel that it would take him six to eight months to recover enough to supervise the grading job for DMS. Part of the job had to be performed with grading work under a separate contract between DMS and G. H. Riddle ("Riddle") and Patel did not want to delay the work until Smith recovered. When Riddle was unable to hire

---

[1]Anil Patel is the husband of Anita Patel. Laxesh acquired the property on March 22, 2007 from Anita Patel. Jai Ganesh acquired the franchise rights from Anita Patel on September 14, 2007. Anita Patel had entered into an earlier agreement with Holiday Inn Express on December 2, 2005.

another grading contractor,[2] he asked Smith to find someone and enter into a subcontract for the work.

On August 7, 2007, Patel entered into a contract with DMS to be the grading contractor for the project. The contract states that it is between DMS, "the General Contractor," and Anil Patel, "the owner." Two days later, DMS entered into a contract with B & J Reed "to perform certain work as set forth on Proposal Nos. 259, and 260 . . . in connection with the construction of a road off of Highway 411, Rome Georgia and a Holiday Inn Express, respectively." Proposal 259 involved the work for Riddle and Proposal 260 involved the work for Anil Patel. After B & J Reed completed the grading work, Jai Ganesh Lodging, Inc. entered into a contract with Enterprise Contractors to construct the hotel.[3] Less than four months after the Holiday Inn opened in July 2008, problems with settling began.

In August 2010, Jai Ganesh Lodging, Inc. and Laxesh, LP (collectively "appellants")[4] sued DMS, B & J Reed, Baron Reed, and Jeremy Reed and alleged

[2] There is some evidence in the record suggesting that Riddle had a reputation in the industry for not paying contactors.

[3] This contract was signed by Anita Patel.

[4] While Anita and Anil Patel were also named as plaintiffs in the initial complaint, the trial court later entered an order dismissing them as plaintiffs based

3

causes of action for breach of contract, negligent construction, and continuing nuisance. All of the defendants moved for summary judgment in their favor on the appellants' breach of contract and negligence claims. After withdrawing its order allowing the appellants to amend their complaint to add Baron Reed and Jeremy Reed as defendants, the trial court granted summary judgment in favor of DMS and B & J Reed on appellants' claims for breach of contract, negligent construction, and continuing nuisance.[5]

1. Appellants assert that the trial court erred in excluding their proffered expert, Steve Horridge, because Horridge had previously been retained by B & J Reed's liability insurance carrier, Auto-Owners Insurance Company ("Auto-Owners") to investigate the cause of soil settlement at issue in this case. According to appellants, the trial court misapplied OCGA § 9-11-26 (b) (4) and this court's decision in *Heyde v. Xtraman, Inc.* 199 Ga. App. 303, 308 (404 SE2d 607) (1991). They urge this court to adopt and apply a two-part test for disqualification of experts used in other

___

upon plaintiffs' counsel representation in oral argument that he would dismiss them from the case. The Patels did not appeal from this order.

[5] Appellants' continuing nuisance claim was asserted after the defendants moved for summary judgment in their favor. Appellants do not contend on appeal that the trial court erred by granting summary judgment in favor of the appellees on their continuing nuisance claim.

jurisdictions. See, e.g., *Koch Refining Co. v. Boudreaux MV*, 85 F3d 1178, 1181 (II) (A) (5th Circ. 1996).

The record shows that Todd Moore, a claims representative with Auto-Owners, hired SEA Ltd., a forensic engineering firm, and Horridge "to investigate the claims of [appellants]" before suit was filed. According to Foster,

> The investigation conducted by Steve Horridge and SEA was done specifically on behalf of Auto-Owners and its insured, B & J Reed, for the purpose of defense of any possible lawsuit and in anticipation of litigation, and discussions with them included our work product, thoughts, mental impressions, and theories of defense with respect to this matter, many of which were not contained in his written report. . . . Neither Auto-Owners or its insured consent to the Plaintiffs or their attorneys retaining Auto-Owners' consulting expert as their own, to using his report or opinion or materials, or to calling him as a witness.

According to Moore, he advised Horridge in a telephone call before November 12, 2009, "that Auto-Owners preferred that he not have any contact with the claimant Mr. Patel or his attorney."

Horridge submitted an affidavit to the court in which he averred that (1) he never signed a confidentiality agreement precluding him from working for other persons involving the same subject matter; (2) that he never spoke with or sent his

5

report to an attorney representing B & J Reed while working for Auto-Owners on the assignment; (3) that "Moore was [his] exclusive contact with Auto Owners . . . and the only person with whom [he] communicated and who directed [his] work;" (4) that he "communicated with Moore regarding the progress of [his] work, and the results of [his] investigation;" (5) that while he spoke with the owners of B & J Reed about facts necessary to his investigation, he never spoke with them about potential strategies or defenses in the event of litigation; (6) that he did not discuss with B & J Reed or Auto-Owners "the strengths or weakness of any side or B & J Reed's anticipated defenses to a lawsuit;" (7) that he was later retained by Mr. Patel "to provide an engineering design and consulting services for structural remediation of the Holiday Inn Express in order to stabilize the building;" (8) that he was later retained by appellants' counsel to serve as an expert witness in appellants' lawsuit against B&G Reed, but never gave appellants' counsel a copy of the SEA Ltd. investigative report and refused to discuss the content of the report "unless it was voluntarily produced and disclosed during discovery in this litigation."

The record also includes an email from appellants' counsel to insurers involved with the claim, including the insurer who had retained Horridge, stating:

6

Suit has been filed. . . . If either Defendant is interested in resolving this matter early and/or pursuing mediation at the outset, please let me know. Our expert is Steve Horridge, which we believe will prove to be very problematic for, in particular, Auto-Owners as it relates to its bad-faith refusal to resolve and settle this matter, notwithstanding our previously tendered time-limited, policy-limits demands.

During discovery, B & J Reed voluntarily produced to all parties the SEA Ltd. report prepared by Horridge for Auto-Owners.

Two years after the lawsuit was filed, B & J Reed moved to disqualify Horridge as an expert on behalf of appellants. After conducting a hearing, the trial court granted the motion, but also concluded that "[t]o the extent he is a fact witness as to remediation, the Court is now inclined to allow him to testify so long as he shall not testify as to his opinions on any issue or of his having been first retained by any other party."

OCGA § 9-11-26 (b) provides:

Unless otherwise limited by order of the court in accordance with this chapter, the scope of discovery is as follows: . . .

(4) (B) A party may discover facts known or opinions held by an expert who has been retained or specially employed by another party in anticipation of litigation or preparation for trial and who is not expected

to be called as a witness at trial . . . upon a showing of exceptional circumstances under which it is impracticable for the party seeking discovery to obtain facts or opinions on the same subject by other means.

"Trial courts have broad discretionary powers under the discovery provisions of the Civil Practice Act and appellate courts have consistently refused to interfere with the exercise of a trial court's discretion except in cases of clear abuse." (Citations and punctuation omitted.) *Heyde,* supra, 199 Ga. App. at 308.

In *Heyde*, this court affirmed the trial court's decision to prohibit an expert from testifying at trial for one party when that expert had originally been retained by an attorney for an opposing party. Id. at 307-309. We concluded "that the exclusion of [the expert]'s testimony was a proper sanction for the violation of the rules of discovery set forth in OCGA § 9-11-26 (b) (4)." Id. at 308. This Code provision "clearly sets forth the procedures a party must follow to obtain discovery from any expert, both those that the opposing party expects to call at trial and those that are not to be called as witnesses." Id. One of the rationales for our decision was that the party seeking to call the expert "did not attempt to follow these procedures and should not now be allowed to circumvent them by engaging in ex parte communications with the opposing party's expert and then asserting that they are not seeking to engage in

8

discovery but seeking to call a witness at trial." Id. We also found that the privileged relationships should be protected and that "[e]xclusion of expert testimony at trial when the expert was retained by the opposing party or his attorney has been recognized as proper in certain circumstances in two federal cases. . . . [Cits.]" 308-309. Finally, we affirmed the trial court's exclusion of the expert because the appellants failed to meet their burden of showing harm, noting that "[w]e do not know if []appellants were able to produce the testimony of other experts whose testimony would render [the expert]'s statements merely cumulative." Id. at 309.

In this case, as in *Heyde*, appellants failed to follow the procedures set forth in OCGA § 9-11-26 (b) before hiring an expert formerly retained by the insurer of an opposing party. We therefore conclude that the trial court did not abuse its discretion by precluding appellants from calling Horridge as an expert witness on their behalf, particularly where the trial court expressly ruled that Horridge could testify "[t]o the extent he is a fact witness as to remediation." Additionally, we conclude that appellants cannot demonstrate harm from the trial court's decision because they were able to hire another expert to provide opinions and findings consistent with those of Horridge and the SEA Ltd. report. *Heyde*, supra.

9

Based upon the particular facts and circumstances of this case, we decline to apply the two-part federal test advocated by appellants. As the Fifth Circuit noted in a case cited by appellants,

> Initially, we point out that this is not a case in which the expert switched sides. If that were the case, no one would seriously contend that a court should permit a consultant to serve as one party's expert where it is undisputed that the consultant was previously retained as an expert by an adverse party in the same litigation and had received confidential information from the adverse party pursuant to the earlier retention. This is a clear case for disqualification. *In disqualification cases other than those in which the expert clearly switched sides*, lower courts have rejected a "bright-line" rule and have adopted the following test:
>
> > First was it objectively reasonable for the first party who claims to have retained the expert to conclude that a confidential relationship existed?
> >
> > Second was any confidential or privileged information disclosed by the first party to the expert?

(Emphasis supplied.) *Koch Refining*, supra, 85 F.3d at 1181 (II) (A). This is a case in which the consulting expert clearly switched sides, and the two-part test in *Koch Refining* should not be applied.

2. The appellants contend that the trial court erred by granting summary judgment in appellees' favor on their breach of contract claim based upon its conclusion that they were not third party beneficiaries of the contract between B & J Reed and DMS. We disagree.

> "The beneficiary of a contract made between other parties for his benefit may maintain an action against the promisor on the contract." OCGA § 9-2-20 (b). In order for a third party to have standing to enforce a contract under OCGA § 9-2-20 (b), it must clearly appear from the contract that it was intended for his benefit. The mere fact that he would benefit incidentally from performance of the agreement is not alone sufficient. There must be a promise by the promisor to the promisee to render some performance to a third person, and it must appear that both the promisor and the promisee intended that the third person should be the beneficiary.

(Citations and punctuation omitted.) *Rowe v. Akin & Flanders, Inc.*, 240 Ga. App. 766, 768 (1) (525 SE2d 123) (1999). "Because a third-party beneficiary may be created only by the express terms of the contract, a court does not generally consider parol evidence in its analysis." (Citations and footnote omitted.) *Perry Golf Course Dev. v. Housing Auth. of Atlanta*, 294 Ga. App. 387, 388 (1) (670 SE2d 171) (2008).

Here, the contracts at issue never refer to Jai Ganesh or Laxesh. While the contracts state that a Holiday Inn Express would be constructed on the site, the site

11

plan referenced in the contracts expressly states that Anil Patel is the owner/developer and Anil Patel listed himself as the owner in his contract with DMS. Based upon these express representations of ownership, we cannot find that DMS or B&G Reed intended a benefit for undisclosed corporate entities that, unbeknownst to them, were the actual owners of the property and the Holiday Inn franchise. See *Dominic v. Eurocar Classics*, 310 Ga. App. 825, 828-830 (1) (714 SE2d 388) (2011) (owner of car not third party beneficiary of contract between mechanic and dealership that performed repair at mechanic's request); *Perry Golf*, supra, 204 Ga. App. at 388-389 (1) (plaintiff not third-party beneficiary of contract because designation of owner in contract inconsistent with finding that plaintiff was the owner); *Danjor, Inc. v. Corporate Constr.* 272 Ga. App. 695, 697-698 (1) (613 SE2d 218) (2005) (corporate franchisee and its owners not third-party beneficiaries of contract between franchisor and contractor that constructed day care center).[6] We therefore affirm the trial court's grant of summary on appellants' breach of contract claim.

---

[6] The cases cited in appellants' brief do not require a different result as none of them involved an affirmative representation in the contract and documents referenced therein that someone other than the plaintiff was the owner of the property at issue. See *Dillon v. Reid*, 312 Ga. App. 34 (717 SE2d 542) (2011); *Rowe*, supra, 240 Ga. App. at 766; *Plantation Pipe Line Co. v. 3-D Excavators,* 160 Ga. App. 756 (287 SE2d 102) (1981).

3. Appellants assert that the trial court erred by granting summary judgment on their negligent construction claims based upon its conclusion that privity of contract was required to assert a negligence claim, that the record contained no evidence of negligence by the defendants, and that the acceptance doctrine precluded appellants' negligent construction claim.

(a) The trial court relied upon this court's opinion in *Dominic*, supra, to conclude that the defendants owed no duty of care to the appellants. In *Dominic*, a case involving negligent car repair, we held:

> While privity of contract is generally not necessary to support an action in tort, "if the tort results from the violation of a duty which is itself the consequence of a contract, the right of action is confined to the parties and those in privity to that contract, except in cases where the party would have a right of action for the injury done independently of the contract." OCGA § 51-1-11 (a). Thus, "[w]here privity of contract between the parties does not exist, to constitute a tort, the duty must arise independent of the contract."

(Citations and punctuation omitted.) 310 Ga. App. at 830 (2). The rule applied in *Dominic*, however, has no application in negligent construction cases, because "our courts have concluded that these claims arise not from a breach of contract claim but from breach of a duty implied by law to perform the work in accordance with industry

13

standards. This cause of action arises in tort and exists independently of any claim for breach of contract." (Citations and punctuation omitted.) *City of Atlanta v. Benator*, 310 Ga. App. 597, 605 (5) (714 SE2d 109) (2011). See also *Rowe*, supra, 240 Ga. App. at 769 (2). The trial court therefore erred by granting summary judgment on appellants' negligent construction claim based upon a lack of privity.

(b) Appellants contend the trial court erred by concluding that they failed to produce evidence of negligence by either defendant. We agree.

> The law imposes upon building contractors and others performing skilled services the obligation to exercise a reasonable degree of care, skill, and ability, which is generally taken and considered to be such a degree of care and skill as, under similar conditions and like surrounding circumstances, is ordinarily employed by others of the same profession.

(Citations, punctuation and footnote omitted.) *Schofield Interior Contractors v. Standard Bldg. Co.*, 293 Ga. App. 812, 814 (668 SE2d 316) (2008).

In support of their negligence claim, appellants relied upon the affidavit of James Ahlberg, a civil and geotechnical engineer who opined, based upon his review of soil reports before and after the grading work was completed, that

> each of the failures, depressions, and settling or downward displacements and resulting damages found within the Holiday Inn

14

Express site were directly caused by the grading contractor's failure to properly and sufficiently compact the fill material used by the grading contractor as was required by the subject grading plans and as is required to be performed by grading contractors, generally, in similar circumstances and in accordance with accepted industry standards.

[E]ach of the defects resulting from the grading contractor's failure to properly compact the fill material was concealed from view and below the surface, such that these defects would not have been observable or detectable by anyone observing the site immediately after the grading contractor had completed its work on site.

An engineer with Rhodes Engineering, the company that prepared the grading site plans, averred in his affidavit that the plans specified "that the grading work was to be compacted to achieve a density of 95% Proctor." It is undisputed that a person with specialized training must perform tests as the grading work progresses to determine if soil is compacted to a density of 95% Proctor.

B&G Reed and DMS contend that they cannot be held liable for negligent grading because they were not contractually responsible for obtaining engineering tests and did not have the expertise to perform the tests. The record shows that B & J Reed performed the work pursuant to its contract with DMS. The contract between DMS and Patel defined DMS as the "general contractor" and stated that DMS "agrees

15

to furnish all material, labor and equipment to perform work to standard as described on plans by Rhodes Engineering Services, Inc. dated April 27, 2007 and inspected by the City of Rome." This contract identified Patel as the "owner." With regard to "grading," the itemized list identified in and attached to the contract stated, "Grade site as shown in grading plan. All dirt must come from on site. Site must balance."

The contract between DMS and B & J Reed was drafted by B & J Reed; this contract identified DMS as the "owner." The construction contract obligated B & J Reed "to perform certain work as set forth on Proposals Nos. 259, and 260. . . ." The work description in Proposal 260 stated, in part: "Grade site as shown on grading plan. Site must balance . . . Owner responsible for all testing." The record contains no evidence that Patel or any other representative of the appellants was provided with a copy of Proposal 260 before construction of the hotel was completed.

Jeremy Reed testified that the purpose of the contract provision stating, "Owner responsible for all testing," was to make someone else responsible for soil compaction testing; he did not do any compaction testing. He denied that the purpose of this provision was to make Smith or his company (DMS) responsible for compaction testing; he knew that DMS did not own the property. He never asked Smith to perform compaction testing and explained that the industry standard does

16

not require grading contractors to perform compaction testing; it is a specialized trade for those certified to perform it. Jeremy Reed denied knowing that the grading plan for the Holiday Inn job required a compaction density of 95 percent Proctor, and denied that Giles Engineering, DMS, or Patel ever told him that he was required to reach this compaction density. He also testified that he did not work for Patel, but instead looked to DMS for "supervisory-related questions." He explained that any direction regarding the scope of his work would have come from Smith and that he expected Smith to alert him if he felt B & J Reed's work was inadequate.

Barron Reed testified that "[i]t is standard in the industry for the owner to hire a compaction company to give us a yes or a no" on whether their work was meeting compaction specifications. With regard to the contract between B & J Reed and DMS, he stated that he knew that Smith was not the owner of the property.

With regard to the provision in his contract with B & J Reed stating, "Owner responsible for all testing," Smith testified that he did not know what testing was meant by this provision. He explained that testing usually done on similar jobs included preliminary testing and compaction testing as the job progressed. He was not aware of whether any soil compaction tests were performed during the Holiday Inn grading work. He never had any discussions with Patel about the importance of

performing soil compaction studies. At the time he entered into the contract with Patel, Smith did not have any knowledge about Patel's background or experience in the construction industry or with site grading in particular.

Smith testified that it is always the owner's responsibility to obtain compaction testing and that he had never obtained such testing. In other grading jobs, the owner would share compaction test results with the grader as the job progressed and the grader "would have to do what was necessary to make it pass." He acknowledged that 95 percent Proctor is the industry standard for structure foundations. He did not recall any conversations with B & J Reed about compaction on the site, but he believed that B & J Reed would have been aware of the industry standard of 95 percent Proctor. While he expected B & J Reed to grade the site to a density of 95 percent Proctor, he testified that he did not know how B & J Reed would know whether the density specification had been met. Smith performed no inspections on behalf of DMS after B & J Reed completed the work.

In his deposition, Patel admitted that he was aware that Smith and his company could not perform the grading work and had hired B & J Reed to do the grading. He testified that he told Smith that he was okay with this arrangement "[a]s long as you supervise it 'cause we - - I have contracted with you." He never had any

18

conversations with Smith about soil compaction. He relied upon the grading contractors to compact the soil and testified that Jeremy Reed told him that the soil would be okay for the construction of the hotel because he was a professional who "kn[e]w the compaction." He admitted that he did not have an agreement with Smith or his company for them to perform compaction testing in connection with the grading; he assumed that it was their responsibility because they were the grader.

Patel retained Giles Engineering before grading began to "[t]o make sure the soil under the building was okay," and no one from Giles Engineering informed him that there were subsurface problems on the lot before the grading work began. He admitted that he did not read the report prepared by Giles Engineering, because it was "scientific stuff that I don't understand." While Patel may have provided a copy of this report to Enterprise Contractors, he did not believe he provided it to or discussed it with DMS or B & J Reed.

Based upon our review of evidence in the record, we conclude that genuine issues of material fact exist with regard to whether DMS negligently supervised the grading work and whether B & J Reed negligently failed to grade the property to the specifications in the grading design plan. The record contains evidence that both of these defendants understood the importance of testing to ensure that the grading work

19

complied with the design specifications. Consequently, issues of fact exist as to whether they allowed the grading work to be completed without tests confirming sufficient compaction of the entire job site. While these defendants may not have been responsible under the terms of the contract for personally performing or paying for the tests, issues of fact exist as to whether they were negligent in failing to take steps to request that such testing be performed as the job progressed, particularly when the contract between the two grading companies specifying that the owner was responsible for testing was never provided to the property owner. While DMS and B & J Reed rely heavily upon the 2006 Giles Engineering report in support of their claim that they are entitled to summary judgment, the expert witnesses disagree about the meaning of the report. The report, as testified to by experts, raises genuine issues of material fact as to whether the property did or did not have existing compaction issues below the surface before it was graded by B & J Reed.

> Except in plain, palpable and undisputed cases where reasonable minds cannot differ as to the conclusions to be reached, questions of negligence, proximate cause, including the related issues of foreseeability, assumption of risk, lack of ordinary care for one's own safety, lack of ordinary care in avoiding the consequences of another's negligence, contributory and comparative negligence are for the jury.

(Citations, punctuation and footnote omitted.) *McCray v. FedEx Ground Package System*, 291 Ga. App. 317, 322 (1) (661 SE2d 691) (2008).

(c) We also find merit in appellants' contention that the trial court erred in applying the acceptance doctrine to bar their negligent construction claims. Even if we were to assume that the acceptance doctrine applies both to owners and to third parties, the acceptance doctrine protects a negligent contractor only "if the defect is not hidden but readily observable on reasonable inspection." (Citations and punctuation omitted.) *Lumsden v. Williams*, 307 Ga. App. 163, 171 (2) (f) (704 SE2d 458) (2010). In this case, appellants' expert opined that "the grading contractor's failure to properly compact the fill material was concealed from view and below the surface," and thus not "observable or detectable," and evidence in the record shows that testing by a specialist was required to determine if the grading contractor had sufficiently compacted the site. Issues of fact therefore exist as to whether the defect was "readily observable on reasonable inspection." Id.

(d) We find no merit in DMS' assertion that appellants' negligent construction claim is barred by a failure to give a notice of a claim under the law governing certain construction defect claims, OCGA § 8-2-35 et seq. By its express terms, these Code provisions apply only to a dwelling defined as "a single-family house, duplex, or

21

multifamily unit designed for residential use in which title to each individual unit is transferred to the owner under a condominium or cooperative system. . . ." OCGA § 8-2-36 (1) and (7); OCGA § 8-2-38 (a). As the hotel does not fall within this definition, these Code sections do not apply.

4. Appellants assert that the trial court erred by withdrawing its previous order that allowed them to amend their complaint to add Baron Reed and Jeromy Reed as defendants. We agree.

The record shows that five months after filing their complaint, appellants moved to add Jeremy Reed and Baron Reed as defendants for two reasons: (1) their belief that the Reeds may have disregarded the separate legal status of B & J Reed, Inc. and (2) the Reeds' "personal involvement, misconduct, and active negligence." At the time of the motion, the statute of limitation had not run and no depositions had been taken. The Reeds opposed the motion, in part, because appellants "offered no excuse or justification for having failed to name and serve the new parties previously." The trial court promptly granted the motion, stating: "The Complaint in this action is filed within the Statute of Limitations so that if the Motion for Leave to Add Party Defendants were denied, Plaintiffs could merely dismiss and refile against

22

all the proposed defendants. There is no discernable prejudice to Defendants by granting this motion."

In September 2012, Baron Reed moved for summary judgment in his favor on the grounds that he did not personally participate in the alleged negligent construction and that privity was lacking for a breach of contract claim. A year later, while all of the summary judgment motions were pending, the trial court entered the following order sua sponte:

> Before ruling on Defendant's Motion for Summary Judgment, it is necessary to enter an order with regard to those parties who interests remain for resolution in this case. Two problems in that regard need to be addressed. First, [the Patels are dismissed for the reasons previously stated in footnote 6 of this opinion.]

> The Second problem in regard to the parties in this case involves the presence of Baron Reed and Jeremy Reed as Defendants individually. As has become increasingly obvious to the Court, it has mistakenly allowed an amendment to the complaint which allowed Plaintiffs to add claims against each of them individually. It is now obvious that the sole reason Plaintiffs sought to add the Reeds, individually, as defendants was to try to pierce the corporate veil if damages were awarded. This has only obfuscated and wasted time and detracted attention from the real issues of liability. Any claims of Plaintiff against B & J Reed Construction, LLC would raise any alleged

negligence of all of the LLC's employees which would include the alleged negligence of the two Reeds individually. The error in adding these two individuals as Defendants became apparent as Plaintiff's discovery regarding the Reeds, individually, focused solely on issues in an attempt to pierce the corporate veil of the LLC. The Court, on September 27, 2011, verbally ordered that discovery was to be limited, and the issue of piercing the corporate veil would be bifurcated. The bifurcated second part of the trial as envisioned by the Court would have occurred only if Plaintiff received a verdict against the LLC which was never paid. By necessity the same Floyd County jury could not decide this additional issue because whether a judgment against the LLC had been paid could not be determined for some time. Couple this with the fact that neither of the Reeds, nor their LLC are residents of this County and the problem is apparent. Each of them is entitled to have that separate issue, if it ever becomes an issue, litigated pursuant to the Georgia Constitution in the County of their residence. The Court has inadvertently created this result, which it now deems improper, by its original Order allowing Plaintiffs to sue the Reeds individually. Their absence as defendants in this case in no way hinders Plaintiffs from presentation of their case; their presence adds nothing except an extraneous issue over which this Court may not have personal jurisdiction.

Therefore, the Court's order [allowing appellants to add parties] is WITHDRAWN. The Plaintiffs' Complaints, as Amended and Recast against Baron Reed and Jeremy Reed are DISMISSED.

We conclude that the trial court abused its discretion by withdrawing its order allowing the appellants to add the Reeds as individual defendants for several reasons. The record shows that the appellants' claims are not based solely upon an attempt to pierce the corporate veil,[7] that the trial court withdrew its order after the statute of limitation had expired,[8] and that it dismissed the appellants' claims against the Reeds based upon venue concerns instead of issuing a transfer order under OCGA § 9-10-31.1 (a).[9]

---

[7] The appellants' fourth amended complaint alleged individual acts of negligence, and the record shows that Jeremy Reed supervised the work on the job site on a daily basis and also ran the bulldozer and compactor. Jeremy Reed testified in his deposition that he thought it was unusual when he saw concrete, stumps, and old building material on the site because he "thought it was virgin ground." The record also shows that Baron Reed was often on the job site and claimed to have assisted a technician to take soil samples for compaction testing. Baron Reed instructed a track hoe operator where to place debris removed from a ditch, informed Patel about concrete and organic debris removed from a ditch, and performed grading work while Jeremy Reed was on vacation.

[8] Settlement problems were noticed in late 2008, and the trial court's dismissal order was entered in August of 2013. See OCGA § 9-3-30.

[9] Because the trial court did not rule on the Reeds' individual motions for summary judgment, we decline to exercise our discretion to do so for the first time on appeal. See *City of Gainesville v. Dodd*, 275 Ga. 834, 838-839 (573 SE2d 369) (2002); *Medical Center of Central Ga. v. City of Macon*, 326 Ga. App. 603, 607 (2) (757 SE2d 207) (2014).

*Judgment affirmed in part and reversed in part. Barnes, P. J., and Branch, J., concur.*