SOUTHERN PILOT INSURANCE
CO., Plaintiff,

v.

CECS, INC., Jason Chatham, Louis Duckwall, Adriana Duckwall, and Robert Miller, as surviving spouse of Trisha Miller and as the administrator/executor of the estate of Trisha Miller, Defendants.

Civil Action No. 1:11–CV–3863–AT.

United States District Court,
N.D. Georgia,
Atlanta Division.

Signed Sept. 12, 2014.

Adam Charles Joffe, R. Tyler Bryant, Robert Malcolm Darroch, Stephanie F. Glickauf, Goodman McGuffey Lindsey & Johnson, LLP, Atlanta, GA, for Plaintiff Southern Pilot Insurance Company.

James Glenn Richardson, Talley Richardson & Cable, P.A., Dallas, GA, for Defendant CECS, Inc. and Jason Chatham.

Lawrence J. LoRusso, Rebecca L. Sample, LoRusso Law Firm, P.C., Atlanta, GA, for Defendant Louis Duckwall and Adriana Duckwall.

Jennifer Suzanne Ivey, Linley Jones, Linley Jones, P.C., Atlanta, GA, for Defendant Robert Miller.

Brenton Sewell Bean, Christine L. Mast, Hawkins Parnell Thackston & Young, LLP–GA, Atlanta, GA, for Michael Dillion and Little and Smith, Inc.

### *ORDER*

AMY TOTENBERG, District Judge.

On September 6, 2011, Defendant Jason Chatham was driving a truck owned by his company Defendant CECS, Inc. ("CECS") when he was involved in a motor vehicle collision with Defendants Louis Duckwall and Trisha Miller. Trisha Miller died and Louis Duckwall was injured. CECS identified the truck as a scheduled vehicle on a Southern Pilot Business Auto Policy ("Policy"). According to Plaintiff Southern Pilot Insurance Company ("Southern Pilot"), however, CECS failed to timely submit its monthly premium payment in August 2011. Southern Pilot contends that after sending a legally sufficient cancellation notice and receiving no response, Southern Pilot cancelled the policy, effective before the collision occurred. On this basis, Southern Pilot has brought this action for declaratory relief. For their part, Chatham and CECS assert that the cancellation notice was insufficient under Georgia law because, among other reasons, at the time they received the notice, no premium was due. Chatham and CECS also lodge a counterclaim of accord and satisfaction.

The parties have filed cross motions for summary judgment. [Docs. 105, 107.][1] For the reasons that follow, the Court **GRANTS** Southern Pilot's Motion for Summary Judgment [Doc. 107] and **DENIES** Defendant CECS, Inc. and Jason Chatham's Second Motion for Summary Judgment [Doc. 105].

### I. LEGAL STANDARD

The Court may grant summary judgment only if the record shows "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). A factual issue is genuine if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A factual issue is material if resolving the factual issue might change the suit's outcome under the governing law. *Id.* The motion should be granted only if no rational fact finder could return a verdict in favor of the non-moving party. *Id.* at 249, 106 S.Ct. 2505.

When ruling on the motion, the Court must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in the non-moving party's favor. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). The moving party need not positively disprove the opponent's case; rather, the moving party must establish the lack of evidentiary support for the non-moving party's position. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party meets this initial burden, in order to survive summary judgment, the non-moving party must then present competent evidence beyond the pleadings to show that there is a genuine issue for trial. *Id.* at 324–26, 106 S.Ct. 2548. The essential question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52, 106 S.Ct. 2505.

The standard of review for cross-motions for summary judgment does not differ from the standard applied when only one party files a motion, but simply re-

---

1. Throughout this Order, the Court refers to CECS and Chatham together as Defendants. Two other Defendants, Louis Duckwall and Adriana Duckwall, join in CECS and Chatham's response to Plaintiff's Motion for Summary Judgment. (Doc. 117.)

quires a determination of whether either of the parties deserves judgment as a matter of law on the facts that are not disputed. *Am. Bankers Ins. Group v. United States,* 408 F.3d 1328, 1331 (11th Cir.2005). The Court must consider each motion on its own merits, resolving all reasonable inferences against the party whose motion is under consideration. *Id.* The Eleventh Circuit has explained that "[c]ross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." *United States v. Oakley,* 744 F.2d 1553, 1555 (11th Cir.1984). Cross-motions may, however, be probative of the absence of a factual dispute where they reflect general agreement by the parties as to the controlling legal theories and material facts. *Id.* at 1555–56.

## II. Factual Background

Keeping in mind that when deciding a motion for summary judgment, the Court must view the evidence and all factual inferences in the light most favorable to the party opposing the motion, the Court provides the factual background below. *See Optimum Techs., Inc. v. Henkel Consumer Adhesives, Inc.,* 496 F.3d 1231, 1241 (11th Cir.2007) (observing that, in connection with summary judgment, courts must review all facts and inferences in light most favorable to non-moving party). This summary statement does not represent actual findings of fact. Instead, the Court has provided the statement simply to place

the Court's legal analysis in the context of this particular case or controversy. Nonetheless, the material facts are largely undisputed.[2]

## A. Overview

CECS obtained a Southern Pilot commercial automobile insurance policy, effective March 2011.[3] According to Southern Pilot, CECS failed to make a timely premium payment in April or May, but each time, after sending CECS a notice of cancellation, CECS remitted its premium payment before the policy was cancelled.

This is not so, Southern Pilot contends, for the July payment. According to Southern Pilot, CECS failed to pay its July bill on time. Southern Pilot once again sent CECS a cancellation notice. The notice stated that the effective date of cancellation would be August 23, 2011. That day came and went without a payment, and thus Southern Pilot sent CECS a "Cancellation Memo," dated August 23, 2011 and received August 27, 2011. CECS submitted its payment electronically on August 24, 2011, but consistent with its policy, Southern Pilot printed CECS a refund check on September 4 and mailed the check to CECS on September 6.

Unfortunately, on September 6, 2011, CECS's owner Jason Chatham was driving a company vehicle when he collided with another vehicle, injuring one and killing another. Southern Pilot and CECS now dispute whether CECS was insured at the time of this collision. CECS's main argument is that it did not receive billing statements, and that its premiums were not due

---

**2.** The Court provides record citations where such citations would be helpful or to clarify a factual matter seriously in dispute. Otherwise, the Court does not provide citations to the record.

**3.** For purposes of this case, the parties have stipulated that Southern Pilot Insurance Com-

pany is a wholly owned subsidiary of General Casualty Company of Wisconsin, which is a wholly owned subsidiary of QBE Regional Companies (N.A.), Inc. (Doc. 62 at 2.) Thus, on occasion, the parties or the Court may refer to the Southern Policy insurance policy as a General Casualty or QBE policy.

on any particular day. Thus, CECS argues, Southern Pilot's July payment demand and subsequent cancellation notices were premature. Southern Pilot obviously takes a different view.

### B. CECS's Procurement of Insurance

Since 2005, CECS worked with its insurance agency Little and Smith, Inc. ("Little Smith") and its agent Michael Dillon, for all of its commercial insurance needs. In February 2011, Little and Smith applied for commercial insurance policies on behalf of CECS. (Pl. Mot. Summ. J. Appx.("Appx.") VV, Doc. 108–13.) The application included a section entitled "Payment Plan," where the applicant presumably could sign up for a monthly, quarterly, or other premium payment schedule. (*See id.* at 11.) This section on the application was left blank. (*Id.*)[4]

In March 2011, Southern Pilot issued two insurance policies to CECS as the named insured: a Commercial Automobile Policy (the "CBA Policy") and a Comprehensive Insurance Policy (the "CCI Policy"). The policies were retroactively effective as of March 1. The relevant policy for this case, the automobile policy, provided a limit of $1,000,000. The annual premiums for the CBA Policy and the CCI Policy were $4,535 and $3,100, respectively, totaling $7,645.

Southern Pilot provides its clients with several billing options. For example, in addition to accepting a prepayment of the entire premium amount, Southern Pilot accepts payments monthly. (Appx. VV, Doc. 108–10 at 3.) Pursuant to its monthly billing plan, Southern Pilot accepts a down payment equal to 16.67% of the total premium followed by 10 monthly installments of 8.33% each. (*Id.*) And if an insured has more than one policy, as was the case here, Southern Pilot's practice is to apply the premium payments pro rata to all policies on the account unless the insured indicates otherwise. (*Id.*)

The record contains no evidence that at the time CECS applied for Southern Pilot insurance, it selected any particular billing option. However, CECS made no advance payment on these policies. (Gragg Dep. at 39, Doc. 113.) Moreover, CECS admits that for all other policies issued to CECS (by different insurance companies) since January 1, 2008, CECS paid an initial payment followed by 10 monthly premium payments. (Pl. 1st Interrog. No. 9, Doc. 109–10 at 6; Appx. RR, Doc. 108–12 at 6.) These monthly premium payment plans were agreed-to in advance by the insurance company and CECS. (Appx. RR, Doc. 108–12 at 6.) The record contains no evidence of a similar advance agreement between Southern Pilot and CECS.

Defendants further assert that "there is no reference within the automobile policy which establishes[ ] any due date for premium to be paid." (Defs. SUMF No. 14, Doc. 105–1.) And Southern Pilot's corporate designee, Kristine Gragg, confirmed that the policy does not contain the billing information. (Gragg Dep. at 30, Doc. 113.) According to Gragg, this information is provided to the customer on a billing invoice. (*Id.* at 30–31.)

Southern Pilot also directs the Court to the "Statement of Account" which was included with the copy of the CECS automobile policy. (Def. Ex. 3, Doc. 114–3 at 9.)

---

4. Plaintiff states in its Statement of Material Undisputed Facts ("SMUF") that CECS chose a "direct bill plan when applying for coverage with Southern Pilot," citing to the 16–page application without a page reference. The Court reviewed the application and found no evidence there that CECS chose any particular bill plan on its application for insurance.

This statement shows a total policy premium of $4,535.00 and states, without explanation, "MONTHLY BILL." (*Id.*) The Statement of Account notes that it is "NOT A BILL" but that "BILLING INFORMATION WILL BE MAILED SEPARATELY." (*Id.*) CECS admits that it received this "Statement of Account" on June 9, 2011. (Doc. 115–4 at 12.)

Finally, Defendants acknowledge that because CECS did not enroll itself in a premium billing plan, CECS was automatically enrolled in Southern Pilot's default billing plan, which is designated as "monthly." (Defs. SUMF No. 19, Doc. 105–1.) Jason Chatham admitted that when he signed up with Southern Pilot, he anticipated receiving bills monthly, every other month, or quarterly. (Chatham Dep. at 63, Doc. 124.) Chatham testified, however, that he never received a billing invoice sent to CECS. (Chatham Dep. at 65; *see also* Defs. SUMF No. 20, Doc. 105–1.)

### C. Southern Pilot's Billing and Cancellation Notice Practice

Southern Policy maintains a billing system known as the Customer Account Billing System ("CABS"). The CABS generates an invoice 20 days before payment is due and assigns a bar code to each printed invoice. Southern Pilot's process for mailing invoices and other notices, including notices of cancellation, is as follows:

(1) a Southern Pilot employee physically picks up the printed and coded documents the morning after they are printed;

(2) the employee hand-delivers the documents to a "Gunther", a high-volume mail processing machine that packages documents for mailing, located 25 feet away from the invoice printer;

(3) a Gunther operator feeds the documents into the Gunther which then scans the barcode for instructions on mailing including how to fold, staple and stuff the documents into envelopes and applies the correct postage on the envelope;

(4) the sealed envelopes are finally mailed through the U.S. Post Office.

Southern Pilot further explains that Gunther has an internal verification component. According to Southern Pilot's corporate designee, Kristine Gragg, Gunther prints a daily report verifying that the machine did what it was supposed to do. (Gragg Dep. at 65, Doc. 113; *see also* Appx. OO ("Sanborn Aff.") ¶¶ 6–8, Doc. 108–10 at 9.) This report identifies correctly completed jobs as "OK." (Sanborn Aff. ¶ 6.) Ms. Gragg is unaware of any additional audit of the Gunther machine. (Gragg Dep. at 66.)

Southern Pilot on occasion receives returned mail as undeliverable. If a billing statement is returned, it is forwarded to the insured's agent. If a cancellation notice is returned as undeliverable, Southern Pilot keeps a scanned copy of the notice in the insured's file.

### D. The First Billing Statement and Notice of Intent to Cancel

According to Southern Pilot, it issued and mailed its first billing statement to CECS on March 11, 2011. (Defs. Resp. Pl. SUMF No. 48, Doc. 199; *see* Appx. H, Doc. 108–5 at 5.) Southern Pilot directs the Court to Exhibit 4 of Gragg's deposition. (Appx. H, Doc. 108–5 at 5.) This billing statement shows the date of billing as March 11, 2011 and a payment due date of April 1, 2011. The statement also identifies the total balance due as $7,640 and the minimum due as $1,914.00, which is about 25% of the total balance. According to Gragg, this minimum amount due represents 16.67% of the total due as the initial

down payment plus April's 8.33%. (Gragg Dep. at 123.) The April billing statement correctly identifies CECS's business address. There is no evidence in the record that the statement was returned as undeliverable.

Jason Chatham, CECS's owner and corporate representative, testified that he did not receive this first billing statement. (Chatham Dep. at 112, Doc. 124.) He explained that his method for keeping tabs on outstanding bills is as follows. After collecting the mail, Chatham would either open it or set it aside to be opened later. (*Id.* at 141.) When he got around to opening the mail, he would open each envelope, discard the "junk items", and place relevant bills in a folder to be paid at a later time. (*Id.*) Once a week, Chatham would review his bills to determine which need to be paid. (Appx. RR, Doc. 108–12 at 4.) Chatham did not, however, organize his bills by due date or otherwise mark bills for payment. (Chatham Dep. at 39.)

When Southern Pilot did not receive a payment from CECS by April 1, the CABS system automatically began the process of cancelling the policy. (*See* Gragg Dep. at 60, Doc. 113 and 113–1.) Accordingly, the CABS system automatically generated a Notice of Intent to Cancel ("Notice of Intent") and two "Notices of Cancellation" ("Cancellation Notices") (one for each policy). (*Id.* at 86.) The first page of these three documents, the Notice of Intent, was labeled with a bar code and dated April 6, 2011. (*Id.* at 63.) Each document was

printed on one piece of paper, front and back. (*See id.* at 86–87.)[5] Thus, the entire mailing included 3 pieces of paper and a return envelope. The three pieces of paper were then physically carried to the Gunther machine which prepared and mailed them. (*Id.* at 62–63, 86–87.)

CECS admits that it received the Notice of Intent on or about April 12, 2014, but denies receiving the two Cancellation Notices. However, CECS's insurance agent Michael Dillon states that he received the April Cancellation Notices and at some point forwarded them to CECS. (Appx. MM ("Dillon Aff.") ¶ 7, Doc. 108–9.)

The April 2011 Notice of Intent, which CECS admits to have received, demanded receipt of the "minimum payment due" before the "effective date of cancellation." (Appx. J, Doc. 108–5 at 8.)

> You are notified that the policies indicated with asterisk (* *) below will cancel in accordance with the terms and conditions of the policy **unless the "minimum payment due" is received at the Home Office of the company prior to the effective date of the cancellation listed below.**

(*Id.* (emphasis added) *see also* Appx. B, Doc. 108–1 at 55.) Down below, however, the Notice included a "Remittance," which requested, "Please mail your payment **immediately** to ensure we receive it in our office on or before the Cancellation Effective Date." (App. J., Doc. 108–5 at 8.) The "Cancellation Effective" date for the automobile policy was noted as April 21, 2011.

---

**5.** Defendants note that the Notice of Intent to Cancel was two pages long. (Def. Resp. Pl. SUMF ¶ 37.) This is consistent with Gragg's testimony, which is that the Notice of Intent to Cancel was printed on one piece of paper, front and back. Defendants also assert that Plaintiff "admitted *in judicio* in response to Defendant's Statement of Undisputed Facts in conjunction with the Defendants' First Motion for Summary Judgment that the Notice of

Intent was the only two page document sent to CECS." (Def. Resp. Pl. SUMF No. 40, Doc. 119.) Defendants mischaracterize this admission. The admission actually stated, "... Southern Pilot transmitted a document entitled 'Notice of Intent to Cancel' dated August 8, 2011, received by CECS, Inc. . . . ." (Doc. 43 No. 5.) Defendants did not ask Southern Pilot to admit that this was the only two-page document sent to CECS.

(Appx. J, Doc. 108–5 at 8.) [6] The "minimum due", according to the Notice of Intent, was $1,914 and the remaining balance was $7,640. (*Id.*)

Likewise, the two Cancellation Notices also showed the "EFFECTIVE DATE OF NOTICE" as April 21, 2011. (Appx. J, Doc. 108–5 at 10.) In a section entitled "Cancellation," the documents stated, "You are hereby notified in accordance with the terms and conditions of the above mentioned policy, and in accordance with law, that your insurance will cease at and from the hour and date mentioned above." (*Id.*) Finally, the Cancellation Notices indicated that the reason for cancellation was "Nonpayment of premium." (*Id.*)

In response to the Notice of Intent, CECS sent a check, dated April 14, 2011, to Southern Pilot for $1,914. (Appx. RR, Doc. 108–12 at 14.) There is no evidence in the record confirming the precise date Southern Pilot received this check, but it is undisputed that the check was posted to CECS's account on April 21, 2011. (Gragg Dep. at 46–47.)

According to Gragg, when a payment is posted before "the physical cancellation happening," the CABS system automatically generates a "Rescission Notice," notifying the insured that the policy remains in effect. (Gragg Dep. at 53–55; Appx. P ("Rescission Notice"), Doc. 108–6.) This is an entirely computer-driven process and no human being makes a decision to generate such a notice. (Gragg Dep. at 53–55.)

The CABS system generated a Rescission Notice, dated April 21, 2011. The Rescission Notice referenced the previously sent "Notice of Intent to Cancel" but made no mention of the Cancellation Notices. The Rescission Notice stated, "[Y]our account status has been changed, and the policies ... will now remain in

force without a lapse in coverage." (Rescission Notice.) The Rescission Notice also noted that if the account had an unpaid balance remaining, "a new billing statement will follow." (*Id.*) Chatham received the Rescission Notice.

### E. The Second Billing Statement and Notice of Intent to Cancel

In May 12, 2011, Southern Pilot generated a second billing statement for a payment due June 1, 2011. (Appx. Q, Doc. 108–6 at 5.) Gragg testified that the CABS system did not issue a billing notice in mid-April for a payment due at the end of May because, as it is set to do, the CABS system does not generate a billing invoice if the previous bill remains unpaid. (Gragg Dep. at 122.) Thus, this May 12, 2011 bill, according to Gragg, represents both the May and June amounts due, or $1,277.48 (about 16.67%). (*Id.*; Appx. Q, Doc. 108–6 at 5.) Again, Southern Pilot contends that it mailed this statement to Chatham. And as before, the record contains no evidence that this statement was returned as undeliverable. Nonetheless, Chatham and CECS maintain they never received the May 12, 2011 billing statement.

When Southern Pilot did not receive the expected premium payment on June 1, 2011, the automated cancellation process began anew. As before, a Notice of Intent and two Cancellation Notices (one for each policy) were generated using the CABS system. All three pieces of paper were once again processed using the Gunther. And also as before, Little & Smith received all three pages, which it forwarded at some point to Chatham. Chatham and CECS again maintain they only received the Notice of Intent.

---

**6.** The Notice of Intent references the commercial automobile policy with an asterisk.

The June 6, 2011 Notice of Intent was substantially identical to the April 6, 2011 Notice of Intent. (Appx. R, Doc. 108–6 at 7.) It provided that the minimum due ($1,277.48) must be received before the effective date of cancellation, now June 21, 2011. (*Id.*) And it included a remittance that urged CECS to send payment immediately to ensure that payment would be received on or before the cancellation effective date.

Also, just like before, CECS responded to the Notice of Intent, sending a check for the amount due. Southern Pilot received the check, posting it to CECS's account on June 15, 2011, several days before the cancellation date. This payment again triggered the automated generation of a Rescission Notice, which Southern Pilot and CECS received. The Rescission was basically identical to the previous one CECS had received. Upon receiving the Rescission Notice, CECS understood that its policies were still in effect.

### F. The Third Billing Statement and Notice of Intent

The pattern continued. Southern Pilot generated a billing statement on July 12, 2011 (Affx. Ex. U, Doc. 108–6 at 15.) The statement requested, by August 1, 2011, the minimum amount due of $1,277.48, representing about 16% of the total premium (or two months' worth). (*Id.*) Gunther's Senior Field Service Technician, Mike Sanborn, reviewed the Gunther Report generated at this time. (Appx. OO ("Sanborn Aff."), Doc. 108–10 at 6–17.) Sanborn confirmed that this billing statement was in fact printed on July 13, 2011, successfully packaged along with a return invoice, and the package was sealed, marked for postage and exited the Gunther machine. (*Id.* ¶¶ 9–12.) Southern Pilot states that it then mailed this invoice to CECS, and the record contains no evidence that this mail was returned as undeliverable. And Southern Pilot's billing account history for the CECS account indicates that a July 12, 2011 billing invoice, and both previous billing invoices, were sent to CECS when its account was in arrears. (Appx. O, Doc. 108–6 at 2–3.) Nonetheless, CECS maintains that it never received this invoice, or any previous one, and it is undisputed that Southern Pilot did not make a premium payment by August 1, 2011.

As one would expect, when Southern Pilot did not receive the payment it expected by August 1, the automated policy cancellation process began anew. The Notice of Intent, dated August 8, 2011, and two Cancellations Notices (one for each policy) were again printed and processed using the CABS system. (Gragg Dep. at 62, 85–86.) Southern Pilot explains, and CECS does not dispute, that "[d]uring the printing process, the identifier '657' was printed on the first page of the mailing, the Notice of Intent, in order to match the mailing with the Post Office receipt." (Defs. Resp. Pl. SUMF No. 71.) The three Notices, printed each on one piece of paper front and back, were then physically carried to the Gunther. (*See* Gragg Dep. at 62, 86.)

The Gunther processed the documents, as the Gunther does, stuffing them into an envelope, affixing the necessary postage, and spitting out the finished package for mailing. The Gunther report for that day confirms that this occurred. (Appx. OO ("Sanborn Aff.") ¶¶ 13–17.) Specifically, Gunther's Senior Field Service Technician, Mike Sanborn, reviewed the Gunther Report and concluded that the Gunther machine "successfully packaged three folded pieces of paper along with a return envelope to be sent to CECS via first class mail and that the documents were inserted into an envelope, sealed, marked for postage, and exited the machine 'OK.'" (*Id.* ¶ 17.)

The envelope containing these three pieces of paper was then delivered to the Post Office for mailing. The Post Office confirmed that item "657" was sent to CECS via first class mail on August 9, 2011. (Appx. Y, Doc. 108–7 at 8.) Defendants do not dispute that this envelope was sent to CECS.

It is also undisputed that CECS received the Notice of Intent contained in that envelope. (Defs. Resp. Pl. SUMP No. 75.) And just as before the Notice of Intent provided that the policies would cancel unless the minimum amount due, $1,277.48, was received before the cancellation effective date, now August 23, 2011. (Appx. V, Doc. 108–7 at 1.) The Notice again included a "Remittance" at the bottom requesting immediate payment to "ensure we receive it in our office on or before the Cancellation Effective Date." (*Id.*) However, consistent with its position thus far, CECS maintains that, while it received the Notice of Intent, it did not receive the two Cancellation Notices.

CECS's insurance agent Michael Dillon states in his affidavit that on or about August 15, 2011, his office received an agent's copy of the Cancellation Notices. (Dillon Dep. ¶ 5, Doc. 108–8 at 29.) Little & Smith produced a copy of the notice it received at this time, which it keeps in its regularly conducted business activity. (*Id.*) Dillon then explains that Little & Smith's employee Donna Moore forwarded copies of the Notices via email to CECS's designated email address, with instruction to pay the premium before August 23, 2011 to avoid cancellation. (*Id.* ¶ 6.) Dillon produced a copy of this August 15, 2011, email sent to CECS, which it keeps as part of its regular course of business. (*Id.* Ex. 2, Doc. 108–9 at 7.) Little & Smith did not receive any error messages when it sent this August 15, 2011 email. Despite this testimony and evidence, Chatham main-

tains that, while he received the Notice of Intent, he never received the Cancellation Notices that Southern Pilot apparently sent to him and that Little & Smith sent via email. (Chatham Dep. at 111.)

Unlike the previous times, in this instance, it is undisputed that CECS did not pay the requested amount of $1,277.48 on or before the effective date of cancellation, here August 23, 2011. (*See* Defs. Resp. Pl. SUMF No. 79.) Instead, CECS transmitted an electronic check through its bank account on August 24, 2011, knowing that the payment would not be received until after August 23, 2011. (Chatham Aff. ¶ 10, Doc. 38–3; Chatham Dep. at 85, Doc. 124.) Chatham testified that he did not contact anyone at Southern Pilot (General Casualty) or Little & Smith to notify them that he submitted a payment past the date indicated on the Notice of Intent. (Chatham Dep. at 85.) According to Southern Pilot's records, the payment posted to CECS's account on August 26, 2011. (Tomalas Dep. at 50–51, Doc. 121.) CECS maintains, however, that the payment was removed from its account on August 25, 2011. (Chatham Dep. at 122–23.)

This time, however, CECS did not receive a Rescission Notice. Instead, CECS received two "Cancellation Memos" dated August 23, 2011 confirming that both policies had been cancelled due to non-payment of premium. (Defs. Resp. Pl. SUMF No. 83.) The Cancellation Memos further provided:

LATE PAYMENTS WILL BE APPLIED TO ANY UNPAID BALANCE. ONCE THE BALANCE IS SATISFIED, ANY REMAINDER WILL BE MAILED TO YOU IN ACCORDANCE WITH THE POLICY TERMS. LATE PAYMENTS WILL NOT REINSTATE THE COVERAGE.

(Appx. AA, Doc. 108–7 at 11; Appx. BB, Doc. 108–7 at 12.) CECS received the

Cancellation Memos on August 27, 2011. (Defs. Resp. Pl. SUMF No. 85; Chatham Dep. at 92.) Chatham contends that although he read the words "YOUR POLICY HAS BEEN CANCELLED DUE TO NON–PAYMENT," and he understood the implication, he did not understand why he received these Memos. (*See* Chatham Dep. at 97.)

Ms. Gragg next explains that, in accordance with Southern Pilot's policy and procedures as laid out in the Cancellation Memo (and identified in all capital letters above), because there was a remaining balance on CECS's account, CECS's August payment was applied to that remaining balance. (Gragg Dep. at 91.) The remaining money, totaling $803.66, was returned to CECS via a refund check on September 2. (*Id.* at 91–92.) Gragg explained that "[o]n the CABS system, every overpayment or every credit on account that's . . . less than a zero balance is held automatically for seven days, and then it's automatically refunded from the system." (*Id.*) Gragg acknowledged that the CABS applies this seven-day delay in issuing a refund payment because generally it is possible that a policy could be reinstated. (*Id.* at 93.)

CECS does not dispute that the refund check was printed on Sunday, September 4, 2011 and, due to the intervening Labor Day holiday, mailed to CECS on Tuesday, September 6, 2011. (Defs. Resp. Pl. SUMF No. 92.) But Defendants points out that on the Friday before, September 2, 2011, Southern Pilot received a letter from Little & Smith requesting that CECS reinstate the policies. (Tomalas Dep. at 65–67, Doc. 112; Defs. Ex. 25, Doc. 114–26.)

Nonetheless, according to Gavin Tomalas, an underwriter working with Southern Pilot on the CECS account, the decision to reinstate the cancelled policy was for the underwriters (not the billing department) to make. (Tomalas Dep. at 84.) He testified that regardless of the request for reinstatement and the collision that occurred on September 6, 2011, the policy would not have been reinstated. (Tomalas Dep. at 65.) He explained that the internal underwriting guidelines do not allow for reinstating a policy that has been cancelled after three or more late payments. (*Id.* at 65–66.) Little & Smith was aware of this underwriting policy. (*Id.* at 66–67.)

In unfortunate timing, on September 6, 2011, Chatham was involved in a fatal vehicle crash while driving a company vehicle. Southern Pilot was notified of this fatal crash that afternoon. It is undisputed that Southern Pilot made the final determination to send the refund check after it learned of the motor vehicle collision. (Tomalas Dep. at 65; *see also* Defs. Resp. Pl. SUMF No. 10, Doc. 121.)

### G. CECS Effort to Reinstate Coverage

Ten days after the collision, CECS and Chatham, by and through counsel, sent a letter to Plaintiff regarding the two policies. (Ex. D31, Doc. 114–31.)[7] Southern Pilot received the letter on September 16, 2011. This letter articulated the same basic arguments Defendants have relied upon in this case including that Defen-

---

7. Southern Pilot primary objection to Defendants' Statement of Additional Material Undisputed Facts is that the facts are immaterial. (*See* Pl. Resp. Defs. Statement of Add'l Material Undisputed Facts ("Pl. Resp. Defs. SAMUF"), Doc. 126.) Southern Pilot also includes argument in its responses, which the Court does not consider as a valid objection. *See* LR 56.1B(2)a(1). In any case, Southern Pilot provides no record citations of any kind in its response. Accordingly, the Court derives the facts for this section from Defendants' Statement of Additional Material Undisputed Facts.

dants have never received a bill or invoice, that no prior arrangements had been made regarding the mode or method of premium payments, and that the Notice of Intent to Cancel was insufficient under Georgia law.

Defendants' counsel also made several demands in this September 16 letter. First, counsel demanded that the April and June premium payments previously paid to General Casualty (Southern Pilot) "be credited and allocated as payment for the premiums due on the auto policy for as long as coverage would be available for such premiums paid." (*Id.* at 5.) Second, counsel stated that CECS "wishes to tender any other amounts which may be due under the Statement of Accounts which were supplied to it on or about June 9, 2011." (*Id.*) Counsel then returned the original refund check of $803.66 along with a check of $2,362.38 for what CECS estimated was the remaining balance on the account. (*Id.* at 6, 16–17.) Counsel expressed the desire that this tender would satisfy all remaining requests for premium payments, such that the policies would remain in effect without lapse through March 2012. (*See id.* at 6.) Counsel requested a response within ten days.

Southern Pilot did not respond to the letter, and instead filed this declaratory judgment action on November 9, 2011.

### III. PROCEDURAL HISTORY

After limited discovery, Defendants CECS and Chatham filed a Motion for Partial Summary Judgment on March 2, 2012. Defendants argued solely that the August Notice of Intent to Cancel, which they admit to receiving on August 17, 2011, was insufficient to effectuate a cancellation of the policy under Georgia law.[8] Defendants correctly explained that the adequacy of an insurance cancellation notice is set forth in O.C.G.A. § 33–24–44 and case law interpreting that statute. As the Court has previously articulated, O.C.G.A. § 33–24–44 provides that, in order to cancel an insurance policy for failure of the named insured to pay its premiums on time, an insurer must provide written notice at least 10 days prior to the effective date of cancellation. O.C.G.A. § 33–24–44(d).[9] The written notice must state "the time when the cancellation will be effective." O.C.G.A. § 33–24–44(b). This statute does not dictate a particular form of the notice. *See id.; see also Reynolds v. Infinity Gen. Ins. Co.*, 287 Ga. 86, 694 S.E.2d 337, 341 (2010). However, under Georgia law, the cancellation notice is effective only if it "positively and unequivocally state[s] that the cancellation is taking place." *Reynolds*, 694 S.E.2d at 341.

Southern Pilot initially responded that the Notice of Intent was a legally sufficient insurance cancellation notice. However, on May 18, 2012, Southern Pilot filed a supplemental response, attaching the "Notice of Cancellation" ("Cancellation Notice") and asserting that it sent this notice to CECS along with its Notice of Intent. (Doc. 60.) The Court entered an order notifying the parties that it would consider the Notice of Cancellation in its assessment of the CECS Defendants' partial summary judgment motion, and granted the CECS Defendants leave to file a re-

---

**8.** Defendants argued in their reply brief that no premium payments were actually due at the time they received the cancellation notices. The Court did not rule on Defendants' novel "no premium due" argument, finding that neither party had developed this argument and the Court was in no position to assess its merits. Defendants revive this argument on summary judgment, and the Court considers it below.

**9.** This provision applies to insurance policies in effect for more than 60 days.

sponse. The CECS Defendants responded, appearing to deny that CECS ever received this Notice of Cancellation.

The Court then denied Defendants' Motion for Partial Summary Judgment. The Court agreed that the Notice of Cancellation ("Cancellation Notice") was unequivocal and, without question, satisfies Georgia's insurance cancellation notice requirements. (Jan. 25, 2013 Ord. at 6, Doc. 70.) And because a question of fact remained, at that point, regarding whether Southern Pilot sent the Cancellation Notice, the Court denied Defendants' Motion. The Court expressly declined to decide whether the Notice of Intent alone satisfied Georgia's insurance cancellation notice requirements.

The Court then ordered the parties to private mediation. During the course of mediation, the parties reached an impasse and required guidance on the Court's position regarding whether the Notice of Intent to Cancel was effective notice to cancel the subject policy in accordance with Georgia law. The Court then issued an Order explaining, in dicta, that Southern Pilot's Notice of Intent failed to satisfy insurance cancellation notice requirements under Georgia law. (*See* Apr. 19, 2013 Ord, Doc. 76.)[10] The Court acknowledged, however, that this was a close question. The Court then directed the parties to continue with the mediation.

The mediation was fruitless. Southern Pilot urged the Court to certify the question of the sufficiency of the Notice of Intent to the Georgia Supreme Court or certify the Court's clarification order for interlocutory appeal. The Court denied both requests. The parties completed discovery, and on January 27, 2014, filed the instant cross-motions for summary judgment.

## IV. ANALYSIS

Both parties move for summary judgment on Southern Pilot's claim for declaratory relief regarding the validity of the cancelation notices. Southern Pilot also moves for summary judgment on Defendants' counterclaim of accord and satisfaction.[11]

### A. Southern Pilot's Declaratory Judgment Claim

Southern Pilot moves for summary judgment in its favor on its claim for declaratory relief. According to Southern Pilot, the Cancellation Notice which it sent to Defendants on August 9, 2011, was sufficient to notify CECS that the automobile policy would cancel on August 23, 2011 unless the minimum amount due of $1,277.48 was received before that date. Because Southern Pilot did not receive the premium payment until after that date, Southern Pilot argues, the policy was cancelled effective August 23, 2011. The Court has already ruled that the Cancellation Notice satisfies Georgia's insurance cancellation notice requirements. (*See* Jan. 25, 2013 Ord., Doc. 70.) And CECS admits that its August payment to Southern Pilot was sent after August 23, 2011. Thus, on its face, Southern Pilot appears to be correct.

Defendants make several arguments to challenge Southern Pilot's position, which the Court considers in turn.

---

10. See the Court's April 19, 2013 Order for further clarification.

11. Defendants state that they also move for summary judgment on their claim of accord and satisfaction, (*see* Defs. Mot. Summ. J., Doc. 105), but in their brief, offer no argument addressing this claim (Defs. Memo. Supp. Mot. Summ. J., Doc. 105–2).

### 1. Whether Southern Pilot is Permitted to Rely on the Cancellation Notice

Defendants argue that Southern Pilot should be prohibited from relying on the Cancellation Notice because its Amended Complaint does not identify this notice as a basis for the declaratory relief it seeks. Defendants argue that Southern Pilot should have amended its Complaint again to attach the "Notice of Cancellation" and its failure to do so, precludes its reliance on the Notice now. (Defs. Resp. at 8, Doc. 118.) The Court disagrees, and in any case, the Court deems Southern Pilot's Complaint so amended. Moreover, the Court previously indicated that it would consider the Cancellation Notice in adjudicating this action and provided Defendants additional time to frame their response to the Cancellation Notice. (*See* Jan. 25, 2013 Ord.) Accordingly, the Court considers the Cancellation Notice on the parties' cross-motions for summary judgment.

### 2. Whether Southern Pilot Actually Mailed the Cancellation Notices

Defendants next argue that they never received the Cancellation Notice and thus the Court should presume that Southern Pilot did not send them. This argument is without merit.

Under Georgia law, evidence that an insurance cancellation notice was mailed to the insured is sufficient to satisfy the notice requirements. *Burnside v. GEICO Gen. Ins. Co.*, 309 Ga.App. 897, 714 S.E.2d 606, 608–609 (2011). "Indeed, [the Defendants'] claim that they did not actually receive the notice of cancellation is irrelevant because 'proof of actual delivery is not necessary' and 'the notice of delivery was legally effected by the act of mailing and securing the Post Office receipt.'" *Burnside*, 714 S.E.2d at 608–609 (quoting *Harris v. U.S. Fid. & Guar. Co.*, 134 Ga.

App. 739, 216 S.E.2d 127 (1975)); *accord Smith v. Allstate Ins. Co.*, 573 F.Supp. 707, 709 (N.D.Ga.1983).

Defendants readily agree that, under Georgia law, what matters is whether an insurance cancellation notice was sent, not received. (*See* Defs. Resp. at 14, Doc. 118.) But Defendants seem to argue that there is insufficient evidence in the record that the Cancellation Notice was actually mailed. Again, the Court disagrees.

The overwhelming evidence in the record supports that Southern Pilot indeed mailed the Cancellation Notices for both policies, and in particular the August notices, along with the Notice of Intent, to CECS. Southern Pilot relies on the CABS system for automatically generating cancellation notices. Ms. Gragg testified that, when Southern Pilot did not receive a payment by the date shown on the billing invoice, the CABS system automatically generated a "Notice of Intent to Cancel" and two "Notices of Cancellation (one for each policy)." These three pieces of paper, printed front and back, were then processed by the Gunther machine, which reported that all three were stuffed into the envelope. Gunther's Senior Field Service Technician confirmed that the Gunther machine did in fact successfully package the three pieces of paper along with a return envelope, sealed the package and properly marked the package for mailing to CECS. The Post Office confirmed by receipt that this package was sent. And CECS admits that it received the Notice of Intent. The act of mailing the notices (which is supported by uncontroverted evidence in the record) combined with Southern Pilot's securing the Post Office receipt, gave the notice of cancellation its legal effect. *See Burnside*, 714 S.E.2d at 608–609 (relying on testimony of the "output manager" that the cancellation notices

were packaged and adequately stamped for mailing).

Defendants offer essentially no evidence to contradict that the cancellation notice was sent. *See Smith,* 573 F.Supp. at 709 (holding that unless the record contains competent evidence to contradict that the cancellation notice was sent, the insured's claim that he never received the notice is irrelevant). Instead, Defendants speculate that, because "the mechanized, electronic billing system of Southern Pilot is so complicated and convoluted," Southern Pilot "doesn't know what it sent before it filed suit." (Defs. Resp. at 16, Doc. 118.) Defendants remind the Court that Southern Pilot did not initially rely on the "Cancellation Notice" in its Complaint or response to Defendants' first motion for summary judgment. According to Defendants, a jury could infer from these facts that Southern Pilot did not actually send the Cancellation Notice.

 This is not so. First, Defendants offer no evidence suggesting that the CABS system, which is apparently industry standard, is particularly complicated.[12] Second, and more importantly, for a jury faced with the overwhelming evidence that the Cancellation Notices were actually mailed to CECS to infer otherwise based on Defendants' arguments would amount to pure conjecture. "While 'it is the jury that chooses among allowable inferences . . . a jury will not be allowed to engage in a degree of speculation and conjecture that renders its finding a guess or mere possibility." *City of Rome v. Hotels.com, L.P.,* 549 Fed.Appx. 896, 900 (11th Cir.2013) (quoting *Daniels v. Twin Oaks Nursing Home,* 692 F.2d 1321, 1326 (11th Cir.

1982)). Ultimately, Defendants offer only unsupported speculation to support their contention that the Cancellation was not sent. "Speculation does not create a *genuine* issue of fact; instead it creates a false issue, the demolition of which is a primary goal of summary judgment." *Cordoba v. Dillard's, Inc.,* 419 F.3d 1169, 1181 (11th Cir.2005) (quoting *Hedberg v. Ind. Bell Tel. Co.,* 47 F.3d 928, 931–32 (7th Cir.1995) (emphasis in original)).

Faced with this record, the only conclusion a reasonable jury could reach is that the Cancellation Notices were sent. And thus, CECS's assertion that they never received the Cancellation Notices is legally irrelevant.

Not only does the uncontroverted evidence support a conclusion that CECS sent the Cancellation Notices, along with the Notice of Intent, in the same envelope, no reasonable jury could conclude that CECS did not receive them. CECS admits to receiving the Notice of Intent, which indisputably was mailed together with the Cancellation Notices. A jury, thus, has no reasonable basis upon which to credit Chatham's testimony that he did not receive the Cancellation Notices. Moreover, CECS's own insurance agent Michael Dillon, has testified that it received an agent's copy of all three of the last notices on August 15, 2011. And Dillon testified that Little & Smith emailed copies of these notices to CECS's designated email address, with instructions to pay the premium before August 23, 2011, to avoid cancellation. Faced with this overwhelming evidence, Jason Chatham's simple assertion, "I didn't receive them," is insufficient to create a question of fact

---

12. Defendants also suggest that the Rescission Notice's failure to identify the Cancellation Notices supports the conclusion that the Cancellation Notices were never sent. (Defs. Resp. at 18, Doc. 118.) Even if this scintilla of evidence were suggestive of a failure to send the Cancellation Notices, it would be insufficient to create a legitimate question of fact.

regarding the receipt of the Cancellation Notices.

### 3. Whether the Cancellation Notices were Premature and Thus Ineffective

Defendants finally argue that, contrary to Southern Pilot's assertion, the premiums were not in fact due as demanded, and thus the Notice of Intent to Cancel (and Cancellation Notices) were premature. Although Defendants persuasively made their case to support this argument, the evidence in the record is insufficient for a reasonable jury to agree.

■ Georgia law provides insureds who fail to pay their premiums on time a 10–day grace period to either pay their premiums or obtain new insurance. Thus, once an insured has missed a premium payment, and before cancelling a policy that has been in effect for more than 60 days, an insurer must first provide written notice at least 10 days prior to the effective date of cancellation. O.C.G.A. § 33–24–44(d). However, "[a] purported notice of cancellation (for nonpayment of premium) sent before the premium is due merely constitutes a demand for payment, and is ineffective to cancel the policy." *Timely Entm't Int'l, Inc., et al. v. State Farm Fire & Cas. Co.*, 208 Ga.App. 467, 430 S.E.2d 844, 846 (1993) (holding that a notice of cancellation mailed on the day the premium was actually due was not premature) (citing *Pennsylvania Nat. Mut. Cas. Ins. Co. v. Person*, 164 Ga.App. 488, 297 S.E.2d 80 (1982)); *accord Atlanta Cas. Co. v. Boatwright*, 244 Ga.App. 36, 534 S.E.2d 516, 517–18 (2000) (holding that a jury question exists as to whether the insured failed to pay premiums when due and whether the insurance company sent the

notice of cancellation after premiums were due).

Defendants first argue that because the record contains "not one single document ... that is signed or agreed to by CECS to a date due or an amount of premium" there is at least a question as to when and how much premium payments were due. (Defs. Resp. at 6, Doc. 118.) [13] The Court, however, sees no reason why an insurance company, which is entitled to premium payments up front, could not accept payments in installments unless it first enters into a contract agreeing to do so. As the Court has previously noted, simply because the Policy is silent as to when premiums are due does not mean the insurer is "force[d] ... to accept premium payments in whatever portion of the total premium that the insured felt like paying at any given time." Couch on Insurance § 72:1 (3d ed. 2012) ("[I]t is universally acknowledged that an insurer cannot be forced to accept less than the premium due and grant pro rata coverage.").

■ Defendants also argue that a question of fact remains regarding when the premium payments were actually due, and thus, the Court cannot conclude as a matter of law that the premiums were overdue when the Cancellation Notices were sent. Defendants rely on *Boatright*. In *Boatwright*, the Georgia Court of Appeals held that a jury question existed as to whether the insured failed to pay premiums when due and whether the insurance company sent the notice of cancellation after premiums were due. *Boatwright*, 534 S.E.2d at 517–18. The insurance company maintained that it sent timely cancellation notices on or after the day premiums were overdue. *Id.* at 516. The trial court disa-

---

**13.** Both parties agree that O.C.G.A. § 33–24–18, which sets forth required provisions in insurance policies, does not specify that such policy must include the payment due date, installment amount or frequency of payment.

greed and held that the insurance company had not properly cancelled the policy. *Id.* at 517. Specifically, the trial court "determined that because [the insurance company] did not produce a copy of an actual premium notice sent to [the insured], it [could not] establish that [the insured] failed to pay a premium when due." *Id.* at 517–18.

The Georgia Court of Appeals reversed. It noted that the record contained "conflicting evidence as to whether a premium was actually due when the purported notice of cancellation was sent." *Id.* at 518. On one hand, the insurer's computer-generated report indicated an arrearage. On the other, the insurer's representative testified that the premiums were paid on the date the notice of cancellation was mailed. The insurer did not need to produce a copy of the actual premium notice to create a question of fact regarding whether premiums were overdue. And most relevant to this case, the court finally noted that "no evidence was produced establishing when [the insured's] premium was actually due." *Id.* For these reasons, the court held that summary judgment was inappropriate. *Id.*

Unlike in *Boatwright,* here the record contains ample evidence that the premiums were due on the date of the billing notice, which is in the record. Moreover, Southern Pilot notified CECS on numerous occasions that premium payments are due monthly. Defendants admit, for example, that they received a "Statement of Account" in June 2011 indicating that a monthly bill was forthcoming. And as noted, the Policy stated that the amount and due date of the premium payment would be identified on a bill. Finally, in addition to the billing notices in the record, Southern Pilot's billing account history for the CECS account indicates that the invoice

due date for August was August 1, 2011. (Appx. O, Doc. 108–6 at 2–3.)

Defendants' primary challenge to this evidence is their assertion that they never received these billing notices, and thus, they should not be held to the premium due date identified therein. Instead, they direct the Court to the Notice of Intent, which they admit they received and which included a "cancellation effective date." Each Notice of Intent is then dated, but that date is consistently identified as the "Date of Billing" rather than the date of "Notice." This arguably shows that the Notice of Intent was actually a billing notice, and the cancellation effective date was the actual due date for premium payments.

This argument, although superficially appealing, too, is without merit. First, the weight of the evidence here shows that Southern Pilot sent to Defendants the billing invoices Defendants claim they did not receive. Southern Pilot presents evidence of the March, May and July billing statements along with uncontroverted testimony that these billing statements were sent to CECS's address via the CABS system and Gunther machine. Just as with the Cancellation Notices, Gunther's Senior Field Technician confirmed that the billing statements, and in particular the July billing statement, were in fact printed, successfully packaged along with a return invoice, sealed and marked for postage by the Gunther machine. Southern Pilot's corporate representative testified that the letter was sent in the mail and not returned as undeliverable. The record contains no evidence that Southern Pilot failed to mail the billing statements.

■ Admittedly, mailing the billing statements creates only a rebuttable presumption that the statements were received, and generally, parties can easily overcome that presumption. *See Vines v. Citizens Trust Bank,* 146 Ga.App. 845, 247

S.E.2d 528, 531 (1978) (holding that the presumption of receipt is rebutted, thereby creating a question of fact, when the alleged recipient testifies that he does not remember receiving the mailing). *But see Ennis v. Atlas Fin. Co.*, 120 Ga.App. 849, 172 S.E.2d 482, 484 (1969) (holding that testimony that one does not remember receiving a mailing is insufficient to overcome the presumption of receipt created by proof of mailing). But even if the jury were to credit Chatham's testimony that CECS never received the billing statement, this offers only a sliver of evidence, insufficient for a reasonable jury to accept Defendants' overall argument that the date on the billing notice (and in Southern Pilot's system) was not the due date of the premiums.

For example, Defendants were given numerous other indications that by the time they received the Notice of Intent, the premium payment was already overdue. Defendants admit to receiving the Notice of Intent to Cancel three times, demanding immediate payment *without* a due date. Instead, the Notice of Intent identified a "Cancellation Effective Date" and warned that if Southern Pilot did not receive payment by this date, the policy would cancel. Chatham admitted that this Notice, after allegedly not receiving a bill, should have seemed unusual to him. (Chatham Dep. at 67.) And after CECS paid the amount demanded before the cancellation date, CECS received a "Rescission Notice." The Rescission Notice stated that CECS's account status "has been changed, and the policies ... will now remain in force without a lapse in coverage." (Rescission Notice.) The Rescission Notice also noted that if the account had an unpaid balance remaining, "a new billing statement will follow." (*Id.*)

In addition, although Jason Chatham denies receiving the Cancellation Notices, as previously explained, his denial alone is insufficient for a jury to conclude he did not receive them. And the Cancellation Notices unequivocally notified Chatham three times that, by the time he received these notices, his premiums were overdue. All of this uncontroverted evidence leads to just one conclusion: by the time CECS received the Notice of Intent, the premium payment due date had already passed. Accordingly, no reasonable jury could conclude based on the evidence in the record, that CECS's August payment was timely tendered.

Defendants finally argue that the parties' course of conduct establishes that the Notices of Intent were essentially invoices. The record contains no evidence to support this. Instead, the uncontroverted evidence shows Defendants' received a Notice of Intent. The Notice of Intent did not state that the premiums were due on a particular date, instead demanding "immediate" payment and noting that the policies were at risk of cancellation. Moreover, after responding to a Notice of Intent to Cancel by paying the premium amount before the cancellation effective date, Defendants received a Rescission Notice. The Rescission Notice indicated that the account status had changed. This indicates that the cancellation was already in process, suggesting that the Notice of Intent was more than a simple invoice. Finally, although CECS contends it never received the Cancellation Notices, as noted above, the record unquestionably establishes that Southern Pilot sent these notices, which unequivocally indicate that premiums were past due. Accordingly, there is no evidence in the record that Southern Pilot relied on the Notice of Intent as a method for billing the insured and notifying it of the premium due date. *Cf. State Farm Mut. Auto. Ins. Co. v. Drury*, 222 Ga.App. 196, 474 S.E.2d 64, 66–67 (1996) (holding that an insurance

company that regularly sends an invoice identifying the premium due date will be estopped to complain of a late payment if it failed to send such an invoice in a particular instance).[14]

For these reasons, the Notice of Intent and Cancellation Notices, which arrived unquestionably after the premium due date had passed, were timely notices of cancellation under Georgia law. *See Timely*, 430 S.E.2d at 846. The Court therefore rejects Defendants' contention that the Notice of Intent (and Cancellation Notices) were simply demands for payment.[15]

#### 4. Conclusion

The uncontroverted evidence in the record establishes that in August 2011, when Defendants' premium payments were overdue, Southern Pilot sent Defendants a timely and sufficient Cancellation Notice, as it had done twice before. The Cancellation Notice complied with Georgia law in terms of timing and substance. (*See* Jan. 25, 2014 Ord., Doc. 70.) Defendants failed to make a premium payment by August 23, 2011, the effective date of cancellation. Accordingly, the policy was cancelled and

not in force at the time of the September 6, 2011 collision involving Defendant Jason Chatham. Southern Pilot issued a Cancellation Memo on August 23, received on August 27, 2011. Accordingly, Defendants' Motion for Summary Judgment [Doc. 105] is **DENIED** and Southern Pilot's Motion for Summary Judgment [Doc. 107] is **GRANTED** to the extent it seeks entry of judgment on its declaratory judgment claim.

### B. Defendants' Claim of Accord and Satisfaction

 Defendants argue that even if the policy was duly cancelled, they are entitled to coverage on a claim of accord and satisfaction. "An accord and satisfaction is an agreement between two parties to give and accept something in satisfaction of a right of action which one has against the other." *Withington v. Valuation Grp., Inc.*, 249 Ga.App. 8, 547 S.E.2d 594, 596 (2001). "An accord and satisfaction is a contract, which requires a meeting of the minds to render it valid and binding. A definite offer and complete acceptance, for consideration, create a binding con-

---

14. Defendants also seem to suggest that because Southern Pilot accepted the April payment on the effective date of cancellation (April 21, 2011) rather than before, Southern Pilot somehow established that it would accept payments past the cancellation effective date. This is incorrect for two reasons. First, there is no evidence in the record at all identifying when Southern Pilot actually received CECS's April check. Instead the record only reveals when this check was *posted* to CECS's account. Moreover, although in one place, the Notice of Intent states that a premium payment must be made prior to the cancellation effective date, at the bottom of the Notice, the Remittance demands immediate payment so that the money is received "on or before the Cancellation Effective Date." Faced with this demand, an insured could argue that it has up to and including the Cancellation Effective date. Had CECS ten-

dered its August payment on the Cancellation Effective date, the Court has little doubt that such would have been acceptable under Georgia law. But CECS did not pay the August payment until *after* the Cancellation Effective date. Thus, its argument about the timing of the April payment is fruitless.

15. The Court finds it unnecessary to discuss Southern Pilot's calculation of the amount of premium payments. Southern Pilot billed Defendants on a pro rata basis, calculating the billing statement as detailed in Ms. Gragg's deposition. This pro rata amount was included on the billing statements, as well as the cancellation notices. The Court is aware of no authority, and Defendants provide none, which prohibits Southern Pilot from setting this type of premium payment schedule.

tract." *USA Mfg. Corp. v. Perfection–Schwank, Inc.*, 271 Ga.App. 636, 610 S.E.2d 600, 603 (2005) (holding that the record contained no meeting of the minds, even though one party negotiated the settlement checks offered by the other, and thus summary judgment was appropriate on an accord and satisfaction claim); *accord Lumsden v. Williams*, 307 Ga.App. 163, 704 S.E.2d 458, 464 (2010) ("An accord and satisfaction is a separate agreement and thus must meet the requirements for forming a contract."). "Generally, '[t]he question whether the parties reached an accord and satisfaction is for the factfinder unless there are no genuine issues of material fact.' " *Id.* (quoting *Sanders v. Graves*, 297 Ga.App. 779, 678 S.E.2d 220 (2009)).

Defendants rely on counsel's September 16, 2011 letter and check tendering the entire amount of premiums due, along with returning the original refund check. In this letter, Defendants urged Southern Pilot to reinstate its policy without a lapse. According to Defendants, because Southern Pilot did not respond to the letter but kept the check, albeit without cashing it, they are entitled, by virtue of accord and satisfaction, to reinstatement of the policy without a lapse in coverage.

Defendants rely on *American Oil Company v. Studstill*, 230 Ga. 305, 196 S.E.2d 847 (1973), to argue that a question of fact exists regarding their accord and satisfaction claim. In *Studstill*, the plaintiff was injured in a trucking accident and sued the trucking company. *Studstill v. Am. Oil Co.*, 126 Ga.App. 722, 191 S.E.2d 538, 539 (1972). The company sent him a $10,000 check with a letter stating that it was "in settlement" of his claims against it. The plaintiff held on to the check, without cashing it, while he endeavored to learn whether it was meant to be a final settlement of his entire claim. After several months, the plaintiff retained counsel. He then learned that the trucking company intended the $10,000 to be a final settlement. About two months later, the company demanded that the plaintiff either accept the offer and negotiate the check or return the check. The plaintiff did neither, and instead retained the check and attempted to continue settlement discussions. Settlement discussions ended, however, and five months later, the plaintiff filed suit. *Id.* The trial court held that the plaintiff's conduct "constituted an irrevocable accord and satisfaction, [and on this basis] granted the defendant's motion for [summary] judgment." *Id.*

The Georgia Court of Appeals reversed. The court explained that it was "perfectly clear to both parties as long as six months after the initial action of the company in forwarding the check that the plaintiff had not and would not accept it if it was to be construed as an accord and satisfaction." *Id.* at 540. The court explained that there "has obviously been no meeting of the [m]inds on the compromise settlement." *Id.* Accordingly, summary judgment in favor of the company was inappropriate. Judge Eberhardt dissented, however, reasoning that the settlement check had been retained for over a year, "despite repeated requests for its negotiation or return." *Id.* at 542 (Eberhardt, J., dissenting). This was a "retention ... for an unreasonable time," and thus Judge Eberhardt reasoned, "an accord and satisfaction had occurred before the suit was filed." *Id.*

The Georgia Supreme Court then weighed in. In a short order, the court affirmed the decision of the Court of Appeals, holding that a question of fact exists when there is a tender and retention of the check but no separate acknowledgement by the claimant-creditor, even though the check was not negotiated. *Studstill*, 196 S.E.2d at 849. The court elaborated on reconsideration that, "on the basis of the

evidence contained in the record in this case[,] a judgment as a matter of law was not demanded for either party." *Id.*

The instant case, however, is materially different. Unlike in *Studstill,* where the plaintiff retained the settlement check for over a year before filing suit, here Southern Pilot promptly filed suit within two months of receiving the check, giving no indication whatsoever that it ever considered the check as any part of a settlement. *See Mehavier v. Tahamtan,* 198 Ga.App. 807, 403 S.E.2d 92, 93 (1991) ("[W]e find no evidentiary support for the trial court's finding that the appellant's retention of the check, uncashed, for a period of approximately two weeks pending the scheduled trial date, manifested an acceptance of it in satisfaction of his claim for treble damages.").

Southern Pilot also argues that accord and satisfaction is simply inapplicable to the facts here. As Defendants recognize, an "accord and satisfaction is an agreement between two parties to give and accept something *in satisfaction of a right of action which one has against the other.*" *Withington,* 547 S.E.2d at 596. Accordingly, there must be a bona fide dispute between the parties that necessitated the accord and satisfaction in the first place. *See Rafizadehk v. KR Snellville, LLC,* 280 Ga.App. 613, 634 S.E.2d 406, 408–409 (2006) (holding that for accord and satisfaction to apply, "that dispute must be bona fide, meaning that both parties must have understood and been aware that the dispute existed prior to the tender of the reduced payment").

Here, Southern Pilot argues that there is no evidence of a bona fide dispute between the parties until the alleged tender on September 16, 2011. Before that time, according to Southern Pilot, it had simply cancelled the policy and notified Defendants of the cancellation. Southern Pilot argues that Defendants essentially created the controversy by demanding reinstatement with their tender letter. *See Rafizadeh,* 634 S.E.2d at 409 ("Georgia law makes clear that his tender of a check in the amount of $3,600 was not sufficient, in and of itself, to create such a dispute."). A reasonable jury could conclude from this evidence that no bona fide dispute existed before CECS tendered its check.

On the other hand, a reasonable jury could find that a dispute over reinstatement existed between CECS and Southern Pilot before the accident and before CECS tendered its check. On September 2, 2011, CECS's insurance agent requested reinstatement of the policies based on CECS's late premium payment. Then, only after the collision occurred on September 6, 2011 did Southern Pilot make the final determination to send CECS a refund check, implicitly denying CECS's request for reinstatement.

In any case, even if Southern Pilot were to reinstate the policy as CECS demands it should do under an accord and satisfaction theory, Defendants have identified no obligation—either in the policy or elsewhere—requiring a reinstatement to be retroactive to the date of cancellation. *See Zilka v. State Farm Mut. Auto. Ins. Co.,* 291 Ga.App. 665, 662 S.E.2d 777, 780 (2008) (holding that although an automobile insurance policy, which had been cancelled due to failure to timely make a premium payment, was reinstated upon receiving the late payment, there was no evidence requiring the reinstatement to be retroactive). Moreover, the notice of cancellation specifically provided that there would be no coverage after the date of cancellation, and a follow up Cancellation Memo, received August 27, 2011, confirmed that cancellation had occurred. *Id.* Likewise, nothing in the policies or under Georgia law requires that, upon request,

Southern Pilot must retroactively apply its previous premium payments in whatever manner the insured prefers.

For these reasons, Plaintiff is entitled to summary judgment on Defendants' counterclaim.

## V. CONCLUSION

This case involves, at best, tragically unfortunate timing. Jason Chatham, the owner of CECS, Inc., consistently failed to get the message that he was paying his premium installments past their due date. Twice he was able to remit the minimum due before CECS's automobile insurance policy was cancelled. But when it mattered most, in August 2011, he remitted his payment after the cancellation effective date. His insurer, Southern Pilot, issued a "Cancellation Memo" and a refund check for unused premium amount. The day Southern Pilot sent the refund check, however, was also the day Chatham was involved in a fatal vehicle collision while driving a company truck. Although there is a sense of unfairness to the circumstances here—Chatham remitted his payment just one day past the cancellation effective date—the evidence before the Court shows that Southern Pilot complied with Georgia law for cancelling insurance policies for nonpayment of premium. Accordingly, Southern Pilot is entitled to summary judgment in its favor.

For the foregoing reasons, the Court **GRANTS** Plaintiff's Motion for Summary Judgment [Doc. 107] and **DENIES** Defendant CECS, Inc. and Jason Chatham's Second Motion for Summary Judgment [Doc. 105]. The Clerk is **DIRECTED** to enter declaratory judgment in Southern Pilot's favor that

(1) Southern Pilot Policy CBA0917025 was cancelled in accordance with Georgia law prior to the September 6, 2011 accident;

(2) Policy CBA09217025 does not provide coverage for any claims arising out of the September 6, 2011 accident;

(3) Southern Pilot is thus not obligated to defend, indemnify, or expend any sums on behalf of CECS or Jason Chatham for any damages or bodily injury arising out of the September 6, 2011 accident, including but not limited to the defense and indemnity of CECS and/or Jason Chatham with respect to Civil Action No. 2012A1322–5 filed by Robert Miller in the State Court of Cobb County and Civil Action No. 2012A2827–1 filed by Louis Duckwall and Adriana Duckwall in the State Court of Cobb County.

Once entering judgment in Southern Pilot's favor, the Clerk is **DIRECTED** to close the case.